99 N.Y.2d 180 (2002)
783 N.E.2d 492
753 N.Y.S.2d 427
In the Matter of PERRY ORENS, Respondent,
v.
ANTONIA C. NOVELLO, as Commissioner of the Department of Health of the State of New York, et al., Appellants.
In the Matter of PAUL S. MAYER, Respondent,
v.
ANTONIA C. NOVELLO, as Commissioner of the Department of Health of the State of New York, et al., Appellants.
Court of Appeals of the State of New York.
Argued October 8, 2002.
Decided November 14, 2002.
*181 Eliot Spitzer, Attorney General, New York City (Sachin S. Pandya, Caitlin J. Halligan, Michael S. Belohlavek and Marion R. Buchbinder of counsel), for appellants in the first and second above-entitled proceedings.
*182 Asher Fensterheim, Tarrytown, for respondent in the first above-entitled proceeding.
Law Offices of Irving O. Farber, PLLC, South Salem (Irving O. Farber and Annette G. Hasapidis of counsel), for respondent in the second above-entitled proceeding.
Judges SMITH, LEVINE and GRAFFEO concur with Judge WESLEY; Judge ROSENBLATT dissents and votes to affirm in a separate opinion in which Chief Judge KAYE and Judge CIPARICK concur.

*184 OPINION OF THE COURT
WESLEY, J.
Section 230 of the Public Health Law establishes a State Board for Professional Medical Conduct (Board). The Board through its committees on professional conduct hears charges of misconduct against physicians, medical residents, physician's assistants and specialist's assistants (see Public Health Law § 230 [7]). Each committee is made up of three members of the Board and must include two physicians and one lay member (see Public Health Law § 230 [6]). In each of these misconduct cases, the committee was comprised of two physicians and a physician's assistant. Respondents argue that because a physician's assistant is not a "lay member" within the meaning of the statute, each hearing committee was improperly constituted. We disagree and remit the remaining issues raised in each case to the Appellate Division.

Matter of Orens:
Perry Orens, M.D., was charged with 34 specifications of professional misconduct arising from his care and treatment of 10 patients. At a prehearing conference, Orens objected to the composition of the three-member panel. He argued that the panel did not include a "lay member" as required by Public Health Law § 230 (6). The Administrative Law Judge (ALJ) overruled the objection. Following the hearing, the professional conduct committee concluded that the Department of Health sustained its burden of proof and revoked Orens' license to practice medicine.
Following an administrative review of the committee's findings, Orens then commenced this CPLR article 78 proceeding in the Appellate Division seeking to annul the determination (see Public Health Law § 230-c [5]). The Court unanimously annulled the determination, granted the petition and remitted the matter to the Board for a new hearing (see Matter of Orens *185 v Novello, 284 AD2d 26 [2001]). The Court rejected the State's claim that "lay member" includes anyone who is not a licensed physician (id. at 28). It concluded that the Legislature intended to exclude from that definition any person subject to the disciplinary measures of section 230, including physician's assistants (see id. at 29-30).

Matter of Mayer:
Dr. Paul S. Mayer, a specialist in obstetrics and gynecology, was charged with numerous specifications of professional misconduct. At the outset of the evidentiary hearing before the professional conduct committee, Mayer objected to its three-member composition claiming that the "lay member" could not be a physician's assistant. The ALJ overruled the objection and ordered the hearing to proceed. At the conclusion of the hearing, the committee sustained nine specifications of misconduct and revoked Mayer's license.
Mayer then commenced this CPLR article 78 proceeding to annul the determination. The Court unanimously annulled the determination, granted the petition and remitted the matter to the Board for a new determination. The Court held that
"[i]n our view, there is merit to the contention that the Hearing Committee was improperly composed of three medical practitioners whose professions are subject to the Public Health Law § 230 disciplinary process, therefore violating the requirement of Public Health Law § 230 (6) that a Hearing Committee `consist of two physicians and one lay member,' and requiring that we annul the determination and remit for a new hearing" (Matter of Mayer v Novello, 288 AD2d 780, 781 [2001] [citing Orens, 284 AD2d at 28]).

Analysis:
The question before us is one of statutory interpretation. Our analysis begins with the language of the statute. If the terms are clear and unambiguous, "`the court should construe it so as to give effect to the plain meaning of the words used'" (Matter of Auerbach v Board of Educ., 86 NY2d 198, 204 [1995] [quoting Patrolmen's Benevolent Assn. v City of New York, 41 NY2d 205, 208 (1976)]). Our objective in this regard is "to discern and apply the will of the Legislature, not the court's own perception of what might be equitable" (Matter of Sutka v Conners, 73 NY2d 395, 403 [1989]).
In cases where the term at issue does not have a controlling statutory definition, courts should construe the term using its *186 "usual and commonly understood meaning" (Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479 [2001]). "Lay member" is not defined in section 230, but the dictionary definition does give some assistance. Merriam-Webster's Collegiate Dictionary defines "layman" as "a person who does not belong to a particular profession or who is not expert in some field" (Merriam-Webster's Collegiate Dictionary 659 [10th ed 2002]; see also Black's Law Dictionary 896 [7th ed] [defining "layman" as "(a) person who is not a member of a profession or an expert on a particular subject"]). Here, physician's assistants are clearly not physicians nor may they be considered to possess the same expertise or training of a physician.
"Only a person licensed or otherwise authorized under [article 131 of the Education Law] shall practice medicine or use the title `physician'" (Education Law § 6522). To qualify for a physician's license, an individual must hold a degree of doctor of medicine (or doctor of osteopathy) and meet experience and examination requirements established by the Board of Regents (see Education Law § 6524; see also 8 NYCRR 60.3 [requiring physicians to complete one year of postgraduate hospital training]). Physician's assistants are licensed under a separate provision of the Education Law (see Education Law art 131-B; §§ 6540-6548). A physician's assistant's educational requirements are considerably different from that of a physician (compare Education Law § 6524 with § 6541 [physician's assistants must have a high school diploma or its equivalent and complete an approved program for physician's assistants]). Physician's assistants are able to perform some medical services, but only when they are under the continuous supervision of a physician and only when those services are within the scope of the supervising physician (see Education Law § 6542). Because the statute makes a simple distinction between physicians and lay members, the most logical view of that distinction is between those who are physicians and those who are not.
Our rules of statutory construction reinforce our view that "lay member" includes all nonphysicians. In 1991, the Legislature amended different portions of section 230 to clarify that other health care workers were within the disciplinary reach of the Board.[1] It did so by dropping its jurisdictional reference to physicians in subdivision (7) and utilizing a new and broader *187 termlicenseewhich encompasses physicians, medical residents, physician's assistants and specialist's assistants (see L 1991, ch 606, § 2, codified at Public Health Law § 230 [7], as amended). However, the Legislature did not amend the statutory references to "physician" or "lay member" in the subdivisions dealing with the composition of its review committees (see Public Health Law § 230 [1], [6]).[2] Certainly, had the Legislature intended to exclude physician's assistants from serving on the Board (or one of its review committees) as "lay members," it could have done so easily by directing that a lay member not be a licensee as defined in the statute. A contemporaneous amendment to another subdivision of the same statute was all that was required. "When different terms are used in various parts of a statute or rule, it is reasonable to assume that a distinction between them is intended" (Matter of Albano v Kirby, 36 NY2d 526, 530 [1975]; see also Rangolan v County of Nassau, 96 NY2d 42, 47 [2001] ["where * * * the Legislature uses different terms in various parts of a statute, courts may reasonably infer that different concepts are intended"]). We think the inference is appropriate here.
Orens and Mayer argue that a different view of the statute is required by its legislative history. In 1975, the Governor proposed to transfer the power of disciplining physicians from the Board of Regents to the Department of Health and the new State Board for Professional Medical Conduct. The original bill required that the Board "consist of not less than twenty physicians licensed in the state for at least five years" (1975 NY Senate-Assembly Bill S 5007, A 6969). Members would be appointed by the Commissioner of Health on recommendations made from specific medical groups (see id.). The legislation was revised after a number of groups expressed opposition to vesting disciplinary power in a board (and its hearing committees) that would be comprised solely of physicians (see NY State Educ Dept News, Nyquist Opposes Transfer of Medical Profession Discipline, Apr. 15, 1975, Bill Jacket, L 1975, ch 109; NY State Educ Dept News, State Board for Medicine Releases Statement on Malpractice, Apr. 15, 1975, at 3, Bill Jacket, L *188 1975, ch 109). The composition of the Board and its hearing committees was altered to include physicians and lay members (see L 1975, ch 109, § 28, as amended). Although the statute has been amended a number of times since 1975, the distinction between physicians and lay members remains.[3]
Orens and Mayer and the Appellate Division come to different conclusions as to the Legislature's intent and the meaning of "lay member."[4] The doctors argue that the compromise legislation attempted to implement a policy that would ensure that the disciplinary board was comprised of some members not involved in medical services. They reason that the Legislature wanted consumers to be involved in reviewing and administering disciplinary measures. In their view, anyone involved in the medical services community (registered nurses, licensed practical nurses, etc.) should not be eligible to serve on the Board and its committees. The Appellate Division, on the other hand, took the view that the Legislature wanted to ensure that those being disciplined were "not judged exclusively by members of the same profession" (Orens, 284 AD2d at 30). The Court seems to have concluded that "profession" for the purposes of its analysis included those health care providers subject to the disciplinary powers of the Board. Thus, a lay member could not be a physician's assistant.
Each interpretation of the statute attempts to divine the policy choice the Legislature intended by enacting the compromise legislation; each is reasonable. But each view overlooks corresponding terms of other statutory provisions that would accomplish their respective interpretation but for the Legislature's failure to use those terms here while specifically employing them elsewhere. For instance, as we have already noted, the Appellate Division's view of the statute could have been *189 accomplished in 1991 by redefining lay member as anyone that was not a "licensee" under the statute.
The position pressed by Orens and Mayerthat the statute envisions the appointment of consumers to serve as lay memberscould have been adopted by the Legislature. Notably, the Education Law provides that the Board of Regents must appoint at least one "public representative" to every professional licensing board (see Education Law § 6508 [1]). A "public representative" is defined as "a person who is a consumer of services provided by those licensed or otherwise supervised or regulated by the boards created hereunder, and shall not be, nor within five years immediately preceding appointment have been * * * a licensee or person otherwise subject to the supervision or regulation of the board to which appointed" (Education Law § 6508 [1] [b] [i]). If the Legislature intended to make "lay member" apply to consumers not associated with the medical professions, it had a more restrictive termpublic representativereadily available. The Legislature chose not to use that term or to incorporate a similar definition of lay member in section 230 of the Public Health Law. While the Bill Jacket of the 1975 legislation does contain several references to "consumer" members of the Boarda letter to "Concerned Citizens" and several other memorandathe Legislature spoke in different terms when it made law (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 585-586 [1998]).
Finally, if the doctors are correct, then the Appellate Division's interpretation is too restrictive. If the Legislature wanted consumers not associated with the medical profession to serve as lay members, notwithstanding the clear statutory language stating otherwise, then the Appellate Division's decision only accomplishes half of the Legislature's intent. Other health care workers not subject to the Board's disciplinary authority could still serve as lay members even though they may have some allegiance to those being disciplined.
Our dissenting colleagues, like the doctors, conclude that the intent of the Legislature is clearthe composition of the panels must include a consumer (see dissenting op at 191)however, they seem unwilling to give full effect to that interpretation. They advance the doctors' arguments, but accept something lessthe Appellate Division's compromise. They are content to allow a host of medical services providers to serve on the panels even though the Legislature wanted "an outsider" who "reflect[s] the medical consumer's perspective" (dissenting op *190 at 191). The operative premise of the dissent's analysis is that "[i]f the legislative history and purpose are clear, they should not be discounted merely because the final version of the bill did not include the clearer language" (dissenting op at 192). It would seem that the dissenters would press that the clarity of the Legislature's intent be given full effect and that no providers of medical services (see dissenting op at 191-192) be included as lay members of the Board.
We agree with the dissent that ultimately courts are asked to identify the lines of demarcation from the words of a statute. In our view, the Legislature chose to identify two groups for membership on the Boardthose who are physicians, a term defined in law, and those who are not. The solution offered by the dissent, and accepted by the Appellate Division, however reasonable, is not supported by construction of the statute.
This Court should be very cautious in interpreting statutes based on what it views as a better choice of words when confronted with an explicit choice made by the Legislature. If the Legislature believes that the statute should mandate that the Board and its hearing committees be comprised of consumers or persons not subject to Board review, it knows how to do so. Until then, the statute will function without judicial caveat or extrapolation.
Accordingly, the orders should be reversed, with costs, and each matter remitted to the Appellate Division, Third Department, for consideration of issues raised in the proceedings but not determined by that Court.
ROSENBLATT, J. (dissenting).
I agree with the Appellate Division that the State's interpretation of Public Health Law § 230 (6) is at odds with the statute's purpose and design. In the face of a statute that requires the inclusion of a "lay member," the State erroneously contends that the disciplinary panel prescribed in Public Health Law § 230 (6) may be comprised of two physicians and a physician's assistant. The Legislature, however, pointedly imposed this requirement to give the medical consumer a voice in medical disciplinary proceedings. A physician's assistant is a medical professional subject to the same Public Health Law § 230 disciplinary procedure as are physicians and in my view cannot be considered a "lay member" for purposes of those proceedings. Because the majority accepts the State's position, I respectfully dissent and would affirm the order of the Appellate Division.
As the Appellate Division correctly recognized, the creation *191 of the State Board for Professional Medical Conduct was a legislative compromise between those who would have vested disciplinary authority in the Department of Education (where the authority resided prior to 1975) and those who would place it under the aegis of the Department of Health. Both approaches carried advantages and drawbacks. Review in the Department of Education (whose Board of Regents consisted of only one physician) had the benefit of involving representatives of the public in disciplinary proceedings. As such, those proceedings would be immune from the pressures and potential favoritism (real or perceived) in judgingand possibly discipliningmembers of one's own profession. A serious disadvantage, however, would be that Department of Education oversight would unreasonably deprive physicians of review by other physicians, i.e., those most knowledgeable in medicine.
On the other hand, vesting review power in the Department of Health posed the converse set of pluses and minuses. Physicians would be judged by knowledgeable professionals, but there would be no input from members of the public, who would presumably be more protective of the medical consumer than of the medical profession.
The Legislature resolved these competing concerns by enacting a statute that provided for review by a three-person committee comprised of two physicians and one "lay member." Although the Legislature did not define the term "lay member," the statute's purpose is clear. The Legislature intended that review by two physicians would endow each panel with considerable medical expertise, while a single lay panelistan outsiderwould reflect the medical consumer's perspective.[1] This balance cannot be accomplished by counting physician's assistants as lay members of such panels.
The legislative goal of balancing professional expertise with outside accountability is evident in the statutory history and the words of the 1991 amendment's sponsor. In language that left no doubt as to the purpose of the panel composition, he explicitly noted that the lay member on the committee would represent "consumer[s]" (see Sponsor's Mem, Bill Jacket, L 1991, ch 606; Mem of State Exec Dept, 1991 McKinney's *192 Session Laws of NY, at 2081). Medical providers are the opposite of medical consumers. Because physician's assistants provide, rather than receive, medical services, the presence of a physician's assistant as the "lay" panel member frustrates rather than furthers the legislative goal.
The majority acknowledges the sponsor's letter but emphasizes that the Legislature chose to use different language in the final version of the bill (majority op at 189). This emphasis debilitates the practice of looking to legislative history to interpret statutes. If the legislative history and purpose are clear, they should not be discounted merely because the final version of the bill did not include the clearer language. Under the majority's approach, even the most lucid expressions in the legislative history could be taken as evidence against the interpretation indicated by the legislative history language.
We all agree that because the Legislature did not define "lay member," we must employ rules of statutory construction to give the term meaning. The State's interpretation has some surface appeal. Its chief virtue is that it can be applied easily, with the line clearly drawn as between physicians as medical professionals and everyone else as lay. Thus, laypeople would include nurses, emergency medical technicians, hygienists, lab technicians and a host of other trained professionals (in addition to physician's assistants) who work in the medical field. This division may strike some as inapt but might be debatable were it not for one insurmountable flaw: If a layperson is defined as "anyone who is not a physician," then all medical residents qualify as laypeople. This cannot be so. No patient would imagineor want to believethat the medical resident who diagnoses a brain tumor, removes a kidney or prescribes a narcotic drug (see 10 NYCRR 80.75 [e]) is a layperson. The State's position thus creates a paradox that the majority does not (and cannot) answer.
In 1991 and 1996, the Legislature specifically amended Public Health Law § 230 (7) to note that the disciplinary proceedings applied to four separate categories of medical professionalsphysicians, physician's assistants, specialist's assistants and residents (see L 1991, ch 606, § 2; L 1996, ch 627). Before 1991, disciplinary panels heard disciplinary matters against physicians only. The Legislature then amended Public Health Law § 230 specifically to include medical residents and the other two categories of medical professionalsin addition to physiciansas subject to disciplinary review. Obviously this delineation would not have been necessary if physicians and *193 residents were one and the same for purposes of Public Health Law § 230. Inasmuch as the Legislature did not regard them as physicians under Public Health Law § 230, residents must, under the State's reasoning, be counted as "lay." And that exposes the fallacy in the State's position. The purpose of composing a disciplinary panel with two physicians and a consumer is simply not met by using two physicians and a medical resident, or, to put it colloquially, by three doctors. A panel so constituted thwarts the Legislature's intent and undoes the compromise.
In addition to the legislative intent and statutory history, the common usage and understanding of the term "lay" does not support the majority's position. Merriam-Webster's Collegiate Dictionary (cited by the Court) treats a "layman" as "a person who does not belong to a particular profession or who is not expert in some field" (Merriam-Webster's Collegiate Dictionary 659 [10th ed 2002]). The other dictionary cited by the Court, Black's Law Dictionary, would treat all persons not "expert on a particular subject" as lay (majority op at 186 [quoting Black's Law Dictionary 896 (7th ed)]). The Court then emphasizes that physician's assistants are not physicians. I do not dispute the point, but I believe the Court asks the wrong question.
In addressing the meaning and usage of the term "lay," the relevant question is not whether physician's assistants are physicians, but whether physician's assistants are "expert in some field" or "expert on a particular subject." Thus, for purposes of statutory interpretation, the question is how we define the relevant "field" or "subject." If the field is coextensive with the requirements for being licensed as a physician, then the State is correct by dividing the world into two simple categoriesphysicians and everyone else. If, however, as I believe to be the case, the relevant field is medicine more generally, then those who are trained as professional medical experts (including physician's assistants and certainly medical residents) cannot be "lay" even though they are not licensed physicians. Because "lay" is undefined in Public Health Law § 230, we must be guided by the statutory purpose in discerning the applicable scope of medical expertise. Accordingly, physician's assistants cannot be considered "lay," as their inclusion would defeat the rationale for lay (i.e., consumer) representation on the committee.
In sum, I cannot subscribe to the idea that the category of laypeople under Public Health Law § 230 includes physician's *194 assistantswho can practice medicine under the direction of a physician (see Education Law § 6542 [1])and medical residentswho hold M.D. degrees and practice medicine while completing their training (see generally Education Law §§ 6524, 6526 [1]).
The majority places too much importance on the Legislature's failure to amend Public Health Law § 230 (6) in 1991 and replace "lay member" with "non-licensee" (as used in the 1991 amendment to Public Health Law § 230 [7]) or "public representative" (from Education Law § 6508). The Court concludes that based on the Legislature's inaction, the statute equates "lay member" with "non-physician." I find this argument unconvincing. Surely the Legislature could have replaced "lay member" with "non-licensee" or "public representative." But of course the Legislature could also have used "non-physician" in 1975, 1991 or any other time if it sought to define "lay member" as "non-physician."[2]
Education Law § 6508 did not include the phrase "public representative" until 1977two years after the passage of Public Health Law § 230 and 14 years prior to the 1991 amendments to Public Health Law § 230 (7) (see L 1977, ch 326, § 1). Of course, the 1991 Legislature could have taken "public representative" from the Education Law and inserted the term into the Public Health Law, but it is difficult to draw meaningful conclusions as to the Legislature's purpose when it merely fails to incorporate a change of an entirely different statute long after its initial enactment. As the majority notes, reasoning by the Legislature's failure to do something is appropriate when "[a] contemporaneous amendment to another subdivision of the same statute [would be] all that [i]s required" (majority op at 187 [emphasis added]).
A legislature's failure to change the wording in a statute implies a desire to retain the previously understood meaning of the wording (see McKinney's Cons Laws of NY, Book 1, *195 Statutes § 193 [a], at 359). If before 1991 there had been an accepted interpretation of "lay member" to encompass all non-physicians, the retention of the language in 1991 would imply the intended retention of the meaning. The State, however, cites no evidence of such a pre-1991 understanding of the term (for example, case law interpreting the statute), and none is to be found. The term "lay member" is no more clear today than it was in 1975 when the Legislature enacted Public Health Law § 230, or in 1991 when the Legislature amended other provisions of the statute. The Legislature's failure to replace "lay member" with a more definite term in 1991 cannot be taken to mean that the lawmakers meant to retain a meaning not previously apparent. Rather, the Legislature's retention of the indefinite phrase "lay member" gives no insight into the phrase's meaning.
It is difficult to draw a line that precisely defines the outer limits of expertise in any field. Conceivably, the line could be drawn so as to exclude from the lay category every professional who exercises expertise in the medical field. Or a case could be made to exclude only those medical professionals who are licensed. The Appellate Division drew the line by excluding from the lay classification those medical professionals who fall within the disciplinary scheme of Public Health Law § 230, notably physicians, residents, physician's assistants and specialist's assistants. While this interpretation is open to the majority's criticism that other medical professionals should be excluded as well, it is better, I submit, to draw the line there than where the majority has drawn it. By distinguishing between persons subject to the Public Health Law § 230 disciplinary proceeding and all others, the panel composition would properly reflect the legislative intent as fully as possible. "Lay" panel members would not fear that their decisions could harm their colleagues, and the State would not need to find panelists who have no medical knowledge whatsoever. While not perfect, that would be the best and wisest course available, and would most faithfully vindicate the legislative intent.
For these reasons, I would affirm the order of the Appellate Division.
In each case: Order reversed, etc.
NOTES
[1] In 1971, the Legislature created a licensing provision for physician's assistants (at that time called physician's associates) (see L 1971, ch 1135, § 4, as amended). This legislation specifically mandated that disciplinary proceedings for physician's assistants be conducted in accordance with the proceedings governing physicians (see id.). That mandate remained in effect after disciplinary authority over physicians was transferred to the Department of Health in 1975 (see L 1975, ch 210, as amended; L 1975, ch 109, § 28, as amended).
[2] Some of subdivision (1) was amended but not the use of the terms "physician" and "lay member" (see L 1991, ch 606, § 1).
[3] In 1986, the Legislature amended section 230 (6) reducing the number of physicians on a hearing committee from four to two (see L 1986, ch 266, § 23).
[4] Both the doctors and the Appellate Division cite to the compromise discussed above as evidence of the Legislature's intent. It should be noted that both rely on a report by the United States Department of Health, Education and Welfare that "found that there was a compelling need for State licensing boards `to move more strongly into the field of discipline' and that the public's `voice should be heard' on such boards since the public had a vital interest in such matters" (Orens, 284 AD2d at 29 [quoting US Dept of Health, Educ and Welfare, 1 Report of Secretary's Commn on Medical Malpractice, at 55]). There is no reference to this report in the Bill Jacket, and no evidence that any legislators were responding to this report in voting for the bill.
[1] The inclusion of lay members on the medical conduct review board was first proposed in an earlier 1975 Assembly bill (A 6969B) that served as a basis for the final compromise bill. A letter by the then-Speaker of the Assembly explained the bill as expanding the membership of the board "to include nine consumers" (Letter from Speaker Stanley Steingut, May 9, 1975, Bill Jacket, L 1975, ch 109; see also 1975 NY Assembly Bill A 6969B).
[2] For this reason, the majority's citations to Rangolan v County of Nassau (96 NY2d 42 [2001]) and Matter of Albano v Kirby (36 NY2d 526 [1975]) are unavailing; those cases provide equal support for my conclusion as they do for the majority's, because the Legislature could have used clearer language to indicate that "lay" meant "non-physician," if that had been the Legislature's intent. The Court says that it is reasonable to believe the Legislature did not mean "lay member" to be a "public representative" or a "non-licensee" because the Legislature could have used those terms. Instead, the Court holds that "lay member" does mean "non-physician," where that term was equally available to the Legislature and was passed over for the less precise "lay member."