This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 36
Betty L. Kimmel,
                 Respondent,
          v.
State of New York et al.,
                 Appellants.
-------------------------------
Emmelyn Logan-Baldwin,
     Interested Party-Respondent.




          Mitchell J. Banas, Jr., for appellants.
          A. Vincent Buzard, for respondents Kimmel and Logan-Baldwin.
          Empire Justice Center et al.; Legal Services of Central New York, amici curiae.




DiFIORE, Chief Judge:

          Under the Equal Access to Justice Act (CPLR article 86; hereinafter EAJA), in certain circumstances a court may award reasonable attorneys' fees and costs to a prevailing plaintiff or petitioner in a suit against the State.  In this appeal we are asked to decide whether the EAJA permits the award of attorneys' fees and costs to a prevailing plaintiff in an action against the

- 1 -

State under the Human Rights Law for sex discrimination in employment by a state agency.  We conclude that it does.

I.

From 1980 through 1994, plaintiff Betty Kimmel worked as a New York State Trooper.  During plaintiff's tenure, she was assigned to several different police stations, often as the first woman to serve as a State Trooper at that station.  In 1995, plaintiff filed a complaint alleging that she was subjected to discrimination, sexual harassment, and retaliation based on her sex and was exposed to a hostile work environment.  She sought back pay, front pay, benefits, compensatory damages, reasonable attorneys' fees, and an injunction restraining defendants from continuing their discriminatory practices.  Defendants included the State of New York and the New York State Division of State Police (collectively, the State defendants), along with individual defendants not relevant to this appeal.

According to the complaint, and supporting exhibits, coworkers posted lewd cartoons portraying plaintiff naked and engaged in various sexual acts, suggested that plaintiff perform sexual acts on them and other coworkers and engaged in other harassing and hostile conduct, including a physical assault on plaintiff, which required emergency room treatment and doctor-ordered work leave.

Throughout the course of plaintiff's 14-year tenure, she made repeated complaints.  In 1982, plaintiff made a sexual

harassment claim under Article 9 of the New York State Police Administrative Manual, but the harassment continued. When she was assaulted by a coworker in 1993, plaintiff requested a formal hearing, but was dissuaded from moving forward when her request to have a private attorney present was denied and her union representative suggested that she would not receive a fair hearing. Despite plaintiff's efforts, neither her supervisors nor her Troop Commanders put a stop to her coworkers' offensive behavior. Plaintiff repeatedly sought legal assistance, but had difficulty finding an attorney to take her case.

In 1995, plaintiff commenced this litigation. The State defendants denied that the agency had engaged in any wrongdoing whatsoever, and asserted as a defense that "[a]ll actions taken by the defendants were official acts taken in the exercise of their discretion." Over the next ten years, the State defendants repeatedly engaged in what the Appellate Division characterized as "obstructionist and delaying tactics" (261 AD2d 843, 845 [4th Dept 1999]), including their failure to comply with basic discovery requests. Eventually, based on their continued defiance of court orders, the Appellate Division struck the State defendants' answers (see 286 AD2d 881, 883 [4th Dept 2001]).

When the case went to trial over a decade after the complaint was filed, plaintiff prevailed and received a jury award of over $700,000. The jury award included past earnings of

$160,000; past lost retirement earnings of $60,000; future lost retirement earnings of $491,000; and past pain and suffering of $87,000. Plaintiff's current and former counsel[1] then sought attorneys' fees and costs under the EAJA.

Supreme Court held that attorneys' fees and costs could not be awarded in this action because the EAJA did not apply "where a plaintiff has recovered compensatory damages for tortious acts of the State and its employees."

The Appellate Division reversed in a split decision, holding that a plain reading of the EAJA and its definition of the term "action" compelled the conclusion that the EAJA applies to this case (76 AD3d 188, 191-194 [4th Dept 2010]). Although the Appellate Division noted that resort to the legislative history was unnecessary, it nonetheless observed that the legislative history supported its position. The Court concluded that if the legislature had not intended the EAJA to cover this type of case, then the legislature, and not the court, was the appropriate body to resolve the issue (see 76 AD3d at 196).

The dissent would have concluded that "'the spirit and purpose of the legislation,' as gleaned from the statutory context and the legislative history," demonstrated that the EAJA should be applied only to review of administrative actions (id. at 199 [citation omitted]).

---

[1] Plaintiff's former counsel intervened in this action and will hereinafter be referred to as intervenor.

Supreme Court subsequently entered a final judgment awarding plaintiff and intervenor attorneys' fees and expenses. Defendants now appeal as of right pursuant to CPLR 5601 (d), bringing the prior nonfinal Appellate Division order up for our review.

II.

We look "first to the plain language of the statute[] as the best evidence of legislative intent" (Matter of Malta Town Ctr. I, Ltd. v Town of Malta Bd. of Assessment Review, 3 NY3d 563, 568 [2004]).  New York's EAJA is located in article 86 of the CPLR.  CPLR 8601 (a) provides in relevant part:

> "except as otherwise specifically provided by statute, a court shall award to a prevailing party, other than the state, fees and other expenses incurred by such party in *any civil action brought against the state*, unless the court finds that the position of the state was substantially justified or that special circumstances make an award unjust"

(CPLR 8601 [a] [emphasis added]).  CPLR 8602 defines the term "Action" as "any civil action or proceeding brought to seek judicial review of an action of the state as defined in subdivision (g) of this section, including an appellate proceeding, but does not include an action brought in the court of claims" (CPLR 8602 [a]).  Subdivision (g) defines "State" as "the state or any of its agencies or any of its officials acting in his or her official capacity" (CPLR 8602 [g]).

Thus, there are only two express limitations on the expansive term "any civil action."  First, in CPLR 8601 (a), the

phrase "except as otherwise specifically provided by statute" makes clear that the EAJA applies "only where another statute does not specifically provide for counsel fees" (Matter of Beechwood Restorative Care Ctr. v Signor, 5 NY3d 435, 443 [2005]).  It is undisputed that the Human Rights Law did not provide attorneys' fees at the time this suit was brought and was not amended to provide such fees until 2015 (see Executive Law § 297, as amended by L 2015, ch 364).[2]  Second, in CPLR 8602 (a), the definition of "action" excludes actions commenced in the Court of Claims.  This case was brought in Supreme Court pursuant to Executive Law § 297 (9), not in the Court of Claims.  Accordingly, neither limitation on "any civil action" applies here.

We have repeatedly held that "the word '*any*' means 'all' or 'every' and *imports no limitation*" (Zion v Kurtz, 50 NY2d 92, 104 [1980] [emphasis added]).  Ignoring both that precedent and the "or" in the statutory definition ("*any* civil action *or* proceeding brought to seek judicial review" [emphasis

_____

[2] Although they do not limit the phrase "any civil action," other provisions in the EAJA place limitations on fee awards. CPLR 8601 (a) provides that fees will not be awarded when the State's position is "substantially justified" or when "special circumstances make an award unjust" (CPLR 8601 [a]).  Individual plaintiffs and petitioners must have a net worth of $50,000 or less at the time the case was commenced, excluding the value of their principal residences, in order to be eligible for fees (see CPLR 8602 [d]).  The lower courts determined that plaintiff met all of these strict requirements, and their applicability is not before us in this appeal.

added]), the State defendants argue that the term "judicial review" in the definition of "action" places another express limitation on "any civil action," thereby excluding cases, like this one, that seek compensatory damages.  According to the State defendants, the term judicial review modifies both "any civil action" and "proceeding" and, therefore, restricts EAJA awards to prevailing parties in article 78 proceedings, as well as a limited subset of civil actions seeking review of a state agency's administrative actions.  We disagree.

In interpreting the term "action" we are guided by the principle that a statute should be construed to avoid rendering any of its provisions superfluous (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 587 [1998]).  Neither article 78 proceedings nor declaratory judgment actions against the State can be brought in the Court of Claims (see CPLR 3001; 7804; cf. Court of Claims Act § 9 [9-a]), instead they must be brought in Supreme Court.  Likewise, the Court of Claims does not have jurisdiction over actions for injunctive relief (see Court of Claims Act § 9; Psaty v Duryea, 306 NY 413, 416 [1954]).  Under the State defendants' interpretation, therefore, the statutory exclusion for "an action brought in the court of claims" would have no meaning (CPLR 8602 [a]).[3]

_____

[3] The dissent argues that the statutory exclusion for "an action brought in the court of claims" is superfluous in any event because the Court of Claims Act already bars attorneys' fees (see dissenting op at 6-7).  But the EAJA's Court of Claims

Additionally, before the EAJA was enacted, we held that Human Rights Law claims seeking monetary relief against the State could be brought in Supreme Court (see Koerner v State of N.Y., Pilgrim Psychiatric Ctr., 62 NY2d 442, 449 [1984]). When the legislature enacted the EAJA five years later, it is presumed to have known of our decision (see Arbegast v Board of Educ. of S. New Berlin Cent. School, 65 NY2d 161, 169 [1985]); thus, the Court of Claims exclusion was not intended to exclude Human Rights Law claims from eligibility for an EAJA award. Indeed, in Koerner, we observed that discrimination is "all the more invidious . . . when it is practiced by the State" (62 NY2d at 448), providing the legislature with all the more reason to permit Human Rights Law claims such as this one to be eligible for an award of attorneys' fees under the EAJA.

Other principles of statutory interpretation guide our reading as well. Where the legislature has addressed a subject and provided specific exceptions to a general rule -- as it has done here -- the maxim *expressio unius est exclusio alterius* applies (see McKinney's Cons Laws of NY, Book 1, Statutes § 240, at 412-413 ["where a statute creates provisos or exceptions as to certain matters the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned"]). The State defendants ask us to create yet another

exclusion was necessary and avoided any suggestion that EAJA's attorney's fees provision conflicted with or abrogated the Court of Claims bar.

exception to the statutory term "any civil action."  To do so, however, would give effect to an assumed legislative intent by judicial construction.

The State defendants offer an additional explanation for how the term "judicial review" impacts the phrase "any civil action or proceeding brought to seek judicial review of an action of the state" (CPLR 8602 [a]).  They argue that the term "judicial review" is used to clarify that there can be no fees awarded with respect to agency proceedings that take place *before* the aggrieved individual, small business, or not-for-profit entity goes into court to appeal -- by way of "judicial review" (i.e., *court* review) -- an adverse agency ruling.  Indeed, both the State defendants and intervenor agree that the term "judicial review" was used to clarify that EAJA fee awards are not available in connection with administrative agency proceedings that *precede* court review (see e.g. Matter of Greer v Wing, 95 NY2d 676, 680 [2001]).  We agree.  By interpreting "judicial review" in this way -- to modify solely the term "proceeding" -- this portion of the definition of "action" is harmonized with the rest of the definition and the Court of Claims exclusion is not rendered meaningless.[4]

_____

[4] Notably, the State defendants concede elsewhere that "judicial review" is often given a broad definition.  For example, they cite Black's Law Dictionary's definition, which includes "[a] court's power to review the actions of other branches . . . of government" (Black's Law Dictionary 924 [10th ed 2014]).  Our decision in Matter of Pan Am. World Airways v New

Our conclusion is also consistent with the EAJA's
statutory scheme.  CPLR 8600 provides that the "intent" of the
EAJA was to create a mechanism comparable to that in the federal
Equal Access to Justice Act (federal EAJA), which is set forth in
28 USC § 2412 (d).  The federal EAJA provides:

> "Except as otherwise specifically provided by
> statute, a court shall award to a prevailing
> party other than the United States fees and
> other expenses, in addition to any costs
> awarded pursuant to subsection (a), incurred
> by that party in *any civil action (other than
> cases sounding in tort), including
> proceedings for judicial review of agency
> action*, brought by or against the United
> States in any court having jurisdiction of
> that action, unless the court finds that the
> position of the United States was
> substantially justified or that special
> circumstances make an award unjust"

(28 USC § 2412 [d] [1] [A] [emphasis added]).  The federal EAJA
undisputedly applies to "any civil action" brought against the
United States except for those sounding in tort.  In our statute,
the Court of Claims exclusion is the equivalent of the federal
exclusion of tort actions, since tort claims against the State
can only be brought in the Court of Claims.[5]  Likewise, our

_____

York State Human Rights Appeal Bd. (61 NY2d 542, 548 [1984]),
likewise uses the term "judicial review" to mean review by a
court without reference to an agency decision -- indeed, we
pointed out in that case that the Human Rights Law expressly
permits either administrative review through the Human Rights
Division or, as an alternative, "judicial review."

[5] As the parties agree, and contrary to the Supreme Court's
holding, claims brought under the Human Rights Law are not tort
claims (Margerum v City of Buffalo, 24 NY3d 721, 730 [2015]
[concluding no notice of claim requirement applies because

EAJA's reference to a "proceeding brought to seek judicial review" was meant to mirror similar language in the federal EAJA. The dissent ignores the fact that the phrase in the federal EAJA "including proceedings for judicial review of agency action" was not even in the federal EAJA when it was first enacted, but was added in 1985 to overrule a federal decision, which held that the federal EAJA did not apply to *court review* of administrative agency rulings (see Gregory C. Sisk, The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct [Part One], 55 La L Rev 217, 230, 230 n 75 [November 1994], citing to Natl. Wildlife Fedn. v F.E.R.C., 870 F2d 542, 543 [9th Cir 1989]).  Indeed, the addition of this phrase in the federal EAJA was intended to clarify the *expansiveness* of the statute's coverage by acknowledging that agency rulings reviewed by the courts, as well as all other civil actions with the exception of tort actions, were eligible for awards.  Thus, our reading of "proceeding brought to seek judicial review" in the EAJA is entirely consistent with its federal counterpart.

Further, at the time our EAJA was passed, federal courts in New York had already held that the federal EAJA was a remedial statute (see Barriger v Bowen, 673 F Supp 1167, 1169 [ND

---

"(h)uman rights claims are not tort actions under (General Municipal Law §) 50-e and are not personal injury, wrongful death, or damage to personal property claims under (General Municipal Law §) 50-i"]).

NY 1987]; <u>Envtl. Defense Fund, Inc. v Watt</u>, 554 F Supp 36, 41 [ED NY 1982]).[6]  New York's EAJA is a remedial statute as well.  As such, it should be "liberally construed to carry out the reforms intended and to promote justice" (McKinney's Cons Laws of NY, Book 1, Statutes § 321), and "interpreted broadly to accomplish [its] goals" (<u>People v Brown</u>, 25 NY3d 247, 251 [2015]; <u>see</u> <u>also</u> <u>Matter of Scanlan v Buffalo Pub. School Sys.</u>, 90 NY2d 662, 676 [1997]; <u>Post v 120 E. End Ave. Corp.</u>, 62 NY2d 19, 24 [1984]).[7]

The purpose of the EAJA is "[t]o *encourage* individuals, small businesses and not-for-profit corporations *to challenge* state action when it lacks substantial justification by allowing them to recover fees and litigation expenses" (Assembly Mem, Bill Jacket, L 1989, ch 770 at 10 [emphasis added]).  The State defendants' restrictive interpretation of "any civil action" is inconsistent with these goals.  Moreover, we have held that limitations should not be read into such remedial statutes "unless the limitation[s] proposed [are] 'clearly expressed'"

---

[6] Additionally, since the federal EAJA's passage, other federal courts have consistently concluded that it is a remedial statute (<u>see</u> <u>e.g.</u> <u>Phillips v Shinseki</u>, 581 F3d 1358, 1367 [Fed Cir 2009], citing <u>Scarborough v Principi</u>, 541 US 401, 406-407 [2004]).

[7] Fee-shifting statutes that provide fees to the prevailing party in derogation of the common-law rule are generally interpreted narrowly (<u>see</u> <u>e.g.</u> <u>Vucetovic v Epsom Downs, Inc.</u>, 10 NY3d 517, 521 [2008]).  However, when interpreting a fee-shifting statute that is remedial in nature, we have held that the statute may nonetheless be interpreted broadly (<u>see</u> <u>Graham Ct. Owners Corp. v Taylor</u>, 24 NY3d 742, 750-751 [2015]).

(Brown, 25 NY3d at 251, quoting People v Sosa, 18 NY3d 436, 440-
441 [2012]).  As noted, there are only two clear exclusions from
the term "any civil action" and the State defendants' proposed
limitation for cases seeking monetary damages is not one of them.

III.

The legislative history from 1989, when the EAJA
became law, demonstrates that the EAJA was "targeted at those
businesses and individuals . . . who often lack the resources
necessary to vindicate their civil and legal rights" (Letter from
New York Lawyers for the Public Interest, Inc., Bill Jacket, L
1989, ch 770 at 46).  Although the plain language of the statute
provides the best evidence of legislative intent, "the
legislative history of an enactment may also be relevant and is
not to be ignored, even if words be clear [because the] primary
goal of the court in interpreting a statute is to determine and
implement the Legislature's intent" (Matter of Tompkins County
Support Collection Unit v Chamberlin, 99 NY2d 328, 335 [2003]
[internal quotation marks and citations omitted]).

Here, the legislative history also leads to the
conclusion that "any civil action" means what it says, subject to
the express exclusions in the statute.  While article 78
proceedings were undoubtedly a focus of interest in the bill, and
some portions of the legislative history reflect this, the
legislative history also supports our conclusion that the statute
permits an award of attorneys' fees and costs to the plaintiff in

this case.

Notably, the 1989 bill that subsequently was codified as CPLR article 86 differed from earlier versions of the statute -- all vetoed by the governor -- in important ways.  Most of the earlier versions applied only to small businesses and not individuals; one excluded claims brought by "state employees"; one defined "judicial review" as "an appeal of agency action"; and, as the governor's vetoes of these earlier bills indicated, all failed to establish a policy of providing New York's poor with access to the courts (see e.g. Governor's Veto Message, No. 71, 1983 NY Legis Ann at 99).  The legislature made very different choices when it drafted and passed the EAJA as we now know it: individual plaintiffs and petitioners are covered with no exclusion for state employees; there is no limiting definition of "judicial review"; and the clear intent is to advance individuals' "civil rights" (the very words used in supporting materials in the bill jacket) as well as other rights.  We conclude that the earlier bills shed light on the critical differences that make the EAJA that *did* pass a true vehicle for improved access to justice for those who would otherwise be unable to afford a lengthy legal battle with a state actor.

Even the legislative history cited by the dissent supports this case's eligibility for fees under the EAJA.  For example, in Governor Mario Cuomo's memorandum approving the bill, the governor commented that the statute authorized a fee award to

"certain plaintiffs or petitioners who prevail in litigation reviewing State agency action or inaction when the State's position in the case is not substantially justified" and that its purpose was to "improv[e] access to justice for individuals and businesses who may not have the resources to sustain a long legal battle" against the State (Governor's Mem approving L 1989, ch 770, 1989 Legis Ann at 336).  That, of course, was the situation here.  The State defendants defended the agency's inaction in failing to address rampant sex discrimination in its ranks on the ground that the agency's official acts were within its discretion.  At the same time, their dilatory and obstructive conduct in the litigation seemed designed to wear down plaintiff and exhaust her resources.

The dissent concludes that "[w]ithin all the legislative history over the course of the decade in which the EAJA was contemplated and developed, there is no discussion of a drastic change in the statute's purpose or applicability from its earlier incarnations" (dissenting op at 13).  This is incorrect. The Report of the Association of the Bar of the City of New York described the change from earlier versions in some detail:

> "Bills denominated 'Equal Access to Justice' Acts have been passed by both houses of the state legislature during the past several years, only to be vetoed by the Governor. Those bills, however, were not truly Equal Access to Justice Acts because, although they assisted small businesses regulated by state agencies, they failed to confer any benefits on low income individuals seeking to enforce civil and legal rights through the courts.

> As Governor Cuomo's 1983 veto message stated,
> 'This bill does not establish a policy of
> enabling the poor to gain access to the
> judicial forum.'  The EAJA in its current
> form would be the first bill to reach the
> Governor's desk that directly promotes equal
> access to justice by significantly lowering
> economic barriers that currently prevent many
> individuals from contesting irrational an[d]
> illegal State government action"

(Assn. of the Bar of City of New York, Report on Legislation,

Bill Jacket, L 1989, ch 770 at 57).

Additionally, other proponents of the EAJA, such as

the State Bar Association, praised the 1989 bill as "designed to

accomplish precisely what its title suggests -- enhanced access

to the courts for those who historically have been unable to make

use of the judicial process simply because they lacked financial

resources" (Letter from New York State Bar Assn., Bill Jacket, L

1989, ch 770 at 48).  These proponents further heralded its

passage as timely given the then-recent findings of the Marrero

Committee (see id. at 49), which was constituted "to study the

extent of the unmet need for civil legal services among the poor

in New York State and to recommend ways to improve the

availability of those services" (Victor Marrero, Committee to

Improve the Availability of Legal Services -- Final Report to the

Chief Judge of the State of New York, 19 Hofstra L Rev 755, 756

[Summer 1991]).  The Committee's Preliminary Report, which was

issued while the EAJA was under consideration, concluded that

"the critical problem of underrepresentation of the poor . . .

'jeopardize[d] both the welfare of poor persons and the

legitimacy of the legal system itself'" (Letter from New York State Bar Assn., Bill Jacket, L 1989, ch 770 at 49, quoting Marrero Committee Preliminary Report).

Moreover, as noted in the governor's signing statement, the 1989 EAJA differed from EAJA bills he had vetoed in the past because, in addition to opening up the EAJA to individuals to vindicate their civil and other legal rights, it had "necessary safeguards" absent from prior versions of the bill (Governor's Mem approving L 1989, ch 770 at 20). Specifically, the governor noted the "appropriate limits" on the classes of individuals and entities that can seek EAJA awards, including the $50,000 net worth requirement (id.).[8] The governor also observed that the 1989 version limited fees and costs to those cases where the State's position was not "'substantially justified'" and to an amount that was deemed "'reasonable'" (id. at 20). Thus, our interpretation does not "open the floodgates" since these various restrictions keep them firmly shut to all but the neediest and most deserving plaintiffs and petitioners.

In discussing these restrictive "necessary safeguards" placed on EAJA awards, the governor referred to the federal EAJA and cited the differences between the federal statute and New

---

[8] New York's $50,000 requirement was the most restrictive of any of the other 29 states that approved state EAJAs around this time, many of which placed no restrictions on an individual's wealth (see Susan M. Olson, How Much Access to Justice from State "Equal Access to Justice Acts"?, 71 Chi-Kent L Rev 547, 561-562 [1995]).

York's EAJA.  The federal EAJA undeniably applies to all civil actions, except those where costs and fees are already provided for by another statute and tort actions.  If the governor understood the EAJA to apply to a subset of civil actions that was more limited than the federal statute's coverage, he surely would have noted it in discussing these important restrictions, given the emphasis placed on safeguards that would lessen the financial burden on the State.  The governor's failure to mention any such limitation in the 1989 bill provides further support for the conclusion that there was no such limitation.

Several other proponents and opponents of the bill observed that the EAJA was modeled after the federal EAJA (Bill Jacket, L 1989, ch 770 at 11, 23, 25, 27, 39).  Yet not one stated that the EAJA excluded virtually all civil actions -- as the State argues it does.  To the contrary, several of the submissions in the Bill Jacket describe the EAJA as applicable to all civil actions brought against the State with the exception of those commenced in the Court of Claims or tort actions, consistent with the federal EAJA (see Bill Jacket, L 1989, ch 770 at 49, 53).  Similarly, a report from the Association of the Bar of the City of New York stated that the EAJA applied to "prevailing parties in civil proceedings, with the exception of tort actions, against the State" (id. at 55).

Finally, attorneys' fees and costs are now specifically provided for under the Human Rights Law in cases of housing

discrimination and in cases of sex discrimination in credit or employment (L 2015, ch 364, § 1). The 2015 amendment reflects the legislature's acknowledgment that fee-shifting provisions are appropriate in the area of Human Rights Law violations. The amendment also means that attorneys' fees in certain civil actions and proceedings brought under the Human Rights Law alleging sex discrimination will no longer be subject to the EAJA's limiting requirements but to the separate requirements set forth in the Human Rights Law itself. Contrary to the dissent's position, the enactment of the 2015 amendment does not mean that litigants prior to that time had no recourse to EAJA; rather, the amendment allows for attorneys' fees without the limiting requirements that EAJA imposes.

IV.

In sum, the plain language, legislative history and remedial nature of the EAJA together demonstrate that this civil action is eligible for an award of attorneys' fees. We hold that for cases commenced before the effective date of the 2015 amendment to the Human Rights Law, the EAJA permits the award of attorneys' fees and costs to a prevailing plaintiff in an action against the State under the Human Rights Law for sex discrimination in employment by a state agency. The plain language of the statute, which is supported by the legislative history, compels the conclusion that "any civil action" encompasses cases brought under the Human Rights Law. It is not

for this Court to engraft limitations onto the plain language of the statute.  Indeed, "[t]his Court should be very cautious in interpreting statutes based on what it views as a better choice of words when confronted with an explicit choice made by the Legislature" (Matter of Orens v Novello, 99 NY2d 180, 190 [2002]).  We agree with the Appellate Division that we may "not legislate under the guise of interpretation and, if application of the EAJA to this action is an unintended result of the plain language of the statute, then that is a consequence best left to the Legislature to evaluate and, if necessary, resolve" (76 AD3d at 196 [internal citations and quotations omitted]).

Accordingly, the judgment appealed from, and order of the Appellate Division insofar as brought up for review, should be affirmed, with costs.

Kimmel v State of New York

No. 36

WILSON, J. (concurring in the result):

I believe the CPLR 8602 (a) language defining "action" as "any civil action or proceeding brought to seek judicial review of an action of the state" is facially ambiguous (although slightly suggestive of review of administrative decision-making). However, I agree with the dissent's conclusion that the

- 1 -

legislative history, coupled with the explicit exclusion of actions in the Court of Claims, supports the proposition that the Equal Access to Justice Act was intended to address article 78 proceedings and other actions seeking injunctive or other equitable relief rather than monetary damages.  Nevertheless, because of the peculiar facts of this case and the admissions made by the State at oral argument, I agree in the result reached by the plurality for the following reasons.

Ms. Kimmel filed her lawsuit in 1995 after suffering widespread gender discrimination and sexual harassment within the New York State Police, where she had been employed as a State Trooper for fourteen years.  She sought not merely damages for herself, but also declaratory and injunctive relief to benefit all women on the force who suffered such discrimination. As chronicled in numerous decisions of the lower courts, and reiterated in the plurality and dissent, the State Police shirked its disclosure obligations and endlessly stonewalled Ms. Kimmel. After twelve years of the State's obstructionist and delaying tactics, and as a sanction for the gross misconduct of the State in this litigation, Supreme Court struck the State's answers and entered judgment in Ms. Kimmel's favor on the claims for money damages. At that point, she had still been utterly frustrated in her efforts to obtain discovery from the State to which she was entitled and which was relevant to all her claims, whether for damages or injunctive relief.  Prior to that point, Ms. Kimmel's

lawsuit could fairly be characterized as one seeking both money damages for herself and injunctive relief for herself and others; subsequent to it, the proceedings have largely been to pursue an award of attorney's fees, less the cost of the trial on damages after the court struck the State's answers.

At oral argument, counsel for the State repeatedly responded that a plaintiff in Supreme Court proceeding not under article 78 but in a lawsuit brought under the Human Rights Act against a State agency and "looking for injunctive relief . . . is seeking judicial review" and "article 86 would apply in such a situation," even if that situation included a plea for both injunctive relief and money damages.  Thus, the State has conceded, if only for the purposes of this case, the Equal Access to Justice Act entitles Ms. Kimmel to recover attorneys' fees for any portion of her lawsuit related to her claim for injunctive relief, including her efforts to reform the discriminatory practices of the State Police to the benefit of other women.

That concession operates in two ways. First, it is an admission by the State that, at least in this case, a civil Human Rights Law action filed in Supreme Court can meet the statutory definition of "judicial review of an action of the state." Because the record before the court in this case would be the same regardless of the nature of the prayer for relief, the State's concession is wholly incompatible with its contention that "judicial review" is limited to article 78 suits challenging

administrative decision-making and can never apply to a suit under the Human Rights Law.

Second, counsel for the State's concession means that Ms. Kimmel, who sued a State agency under the Human Rights Law for both money damages for herself and injunctive relief benefitting herself and others, is entitled to recover some amount of attorney's fees. Although the State advocated apportioning the fees between those allocable to her claim for money damages and those allocable to her claims for injunctive and declaratory relief, those portions of the suit are, in this case, indistinguishable as a result of the State's egregious discovery abuses and the attendant unusual procedural history. Thus, the result of the plurality's opinion is the same result I would reach, albeit for a different reason.

Therefore, I would affirm.

Kimmel v State of New York

No. 36


GARCIA, J.(dissenting):

I agree with the plurality that the conduct of the defendants in this case was egregious.  That plaintiff received truly reprehensible treatment, however, does not entitle her attorneys to recoup fees under a statute that does not, and has never been used to, provide for such an award in this type of case.

I.


Plaintiff, one of the first women to become a state trooper in New York, experienced years of discrimination and harassment during her employment by defendants State of New York and the New York State Division of State Police.  This long period of mistreatment included vandalism of plaintiff's property, the posting of offensive cartoons depicting plaintiff performing sexual acts, and a physical attack by a co-worker that placed her in the emergency room.  After attempts to seek redress of these wrongs internally, plaintiff filed suit in 1995 alleging sex discrimination, sexual harassment, retaliation, and hostile work environment and seeking $15,000,000 in damages as well as back pay, front pay, benefits, injunctive relief, and reinstatement.  Before the suit was filed, plaintiff obtained two

- 1 -

attorneys, one of whom (the intervenor) had extensive experience in discrimination law cases.  Both attorneys signed a contingency fee contract with plaintiff, agreeing to share one-third of any award received.

Plaintiff's complaint attached numerous exhibits that documented the harassment she experienced.  In response to plaintiff's complaint, the State defendants denied wrongdoing. After "obstructionist" and dilatory conduct on the part of the State, a court later found that defendants "had repeatedly disobeyed discovery orders of Supreme Court and [the Appellate Division]" and so struck defendants' answer (286 AD2d 881, 882 [4th Dept 2001]; 261 AD2d 843, 845 [4th Dept 1999]).  Judgment was entered in plaintiff's favor on the issue of liability.[1]

In 2005, after a dispute arose, plaintiff fired the intervenor.[2]  After the intervenor refused to provide plaintiff with the case file, plaintiff and her remaining attorney moved to obtain the file and the intervenor cross-moved for a lien.  A judge ordered the intervenor to turn the case file over to

---

[1] In 2002, the parties entered into a stipulation pursuant to which defendants agreed to pay more than $76,000 of plaintiff's attorneys' fees to resolve a sanctions motion.

[2] The intervenor's high fee requests led in part to a breakdown in the attorney-client relationship.  Plaintiff attested that "[f]rom May 2004 to March 2005 [the intervenor's] bill increased by 50% . . . I cannot pay this bill."  She also stated that the intervenor "would continually file appeals, motions, etc. without ever conferring" with plaintiff and that plaintiff believed some of these actions "were unnecessary."

plaintiff's remaining attorney and placed a charging lien on any proceeds recovered in the pending suit.  At that point, the intervenor's bill for her services was approximately $490,000.

On the eve of trial in 2006, in a letter responding to a general question about fees posed by the trial judge "[a] few months ago," plaintiff's remaining attorney raised for the first time the theory that the case might qualify for a fee award under the EAJA.  In the letter, that attorney inquired about "defendants' position concerning settlement . . . in light of this information [that plaintiff may be entitled to fees]" and stated that any "[s]erious settlement talks really means getting beyond a 6 figure amount[]."  The parties did not reach a settlement.  After a trial on damages in 2006, a jury awarded plaintiff approximately $800,000 total for lost past earnings, lost past retirement earnings, lost future retirement benefits, and past pain and suffering.

In 2008, plaintiff, her remaining attorney, and the intervenor moved for attorneys' fees and expenses under the EAJA. The intervenor asked for more than $1,000,000 in attorneys' fees, including "enhanced fees" of $180,663 for what she described as "'bad faith' and frivolous and dilatory conduct of the State of New York and the New York State Police in their defense of plaintiffs' claims."[3]  Supreme Court denied the motion, finding

---

[3]  Legislators and the Governor were particularly concerned about attorneys seeking enhanced fees when considering passage of the EAJA (see Letter from Sponsor, Bill Jacket, L 1989, ch 770,

that the EAJA did not apply to plaintiff's claim for compensatory

damages.  A divided Appellate Division reversed, holding that

plaintiff's claim was eligible for attorneys' fees under the

EAJA.  This holding was based on the Appellate Division

majority's determination that the plain meaning of the EAJA

compelled a conclusion that it applied to this case; that the

statute's Court of Claims exclusion would be superfluous if the

EAJA was limited to article 78 proceedings and declaratory

judgment actions because those actions cannot be brought in the

Court of Claims anyway; and that the legislative history

supported its interpretation.  Two justices dissented, noting

conversely that the statute's plain meaning and legislative

history demonstrated that the EAJA was inapplicable to

plaintiff's suit.

## II.

The EAJA, which also bears the title "Counsel Fees and

Expenses in Certain Actions Against the State," provides that "a

court shall award to a prevailing party . . . fees and other

expenses incurred by such party in any civil action brought

against the state, unless the court finds that the position of

the state was substantially justified or that special

circumstances make an award unjust" (CPLR 8601 [a]).  Section

8602 provides corresponding definitions for terms in the statute

and defines "action" as "any civil action or proceeding brought

at 8).

to seek judicial review of an action of the state as defined by subdivision [g] of this section, including an appellate proceeding, but does not include an action brought in the court of claims" (CPLR 8602 [a]).

The crux of this dispute concerns the clause "any civil action or proceeding brought to seek judicial review" and whether that includes suits for compensatory damages. Essentially, the plurality reads the statute to say "any civil action or *any* proceeding brought to seek judicial review" (see plurality op at 6-7). Yet the definition of "civil action" enacted by the legislature limits the EAJA's applicability to either civil actions brought to seek judicial review of an action of the state, or proceedings brought to seek judicial review of an action of the state. This limitation accordingly cabins the applicability of the EAJA to actions seeking to challenge an action taken by a state agency or one of its officials acting in his or her official capacity, including article 78 proceedings, declaratory judgment actions involving state agency rulings, and actions seeking injunctive relief from state agency rulings.

This interpretation is consistent with the other provisions of article 86. The statute provides in section 8601 (a) that "[w]hether the position of the state was substantially justified shall be determined solely on the basis of the record before the agency or official whose act, acts, or failure to act gave rise to the civil action." But there is no such "record

before the agency or official" in plenary actions seeking principally compensatory damages like the instant action. Consistent with this provision, "position of the state" is defined as "the act, acts or failure to act from which judicial review is sought" (see CPLR 8602 [e]).  Likewise, section 8602 defines "fees and other expenses" as those "incurred in connection with an administrative proceeding and judicial action," further demonstrating that the statute applies only to suits challenging state administrative action.

The plurality supports its argument for a broad reading of the EAJA with an assertion that under a narrow interpretation, the statute's provision carving out "an action brought in the court of claims" is superfluous (plurality op at 7-9).  The Appellate Division majority also noted that, under the interpretation outlined above, "the language excluding actions commenced in the Court of Claims would be unnecessary inasmuch as such proceedings do not generally fall within that court's limited jurisdiction" (76 AD3d at 406).  But this provision is "unnecessary" under either interpretation.  The Court of Claims Act specifically bars attorneys' fees (see Court of Claims Act § 27).  Even under the plurality's interpretation of the EAJA, therefore, the Court of Claims "carve out" is superfluous. Accordingly, in light of the language used in the remainder of the statute, as well as the legislative history supporting a narrow interpretation, this language must be attributed to a

redundancy on the part of the legislature and not as an indication that the statute should be read broadly. "Redundancy is hardly unusual in statutes addressing costs," and "the canon against surplusage is not an absolute rule" (<u>Marx v General Revenue Corp.</u>, 133 S Ct 1166 [2013]).[4] The carve out for the Court of Claims merely reiterates that compensatory damage claims -- required in nearly every case to be brought in the Court of Claims -- do not qualify for attorney's fees under the EAJA.

The fact that Human Rights Law cases may be brought in Supreme Court does not affect this interpretation. Before we decided <u>Koerner v State of New York</u> (62 NY2d 442 [1984]), this case would have originated in the Court of Claims, because money damages are not otherwise available against the State in Supreme Court; <u>Koerner</u> created a narrow exception, pursuant to which Human Rights Law cases may be brought in either Supreme Court or the Court of Claims. While the legislature is "presumed to have known of our decision" in <u>Koerner</u> (plurality op at 8), the general impression at the time, which remains true in all other contexts outside the HRL, was that the State could not be sued for monetary damages in Supreme Court. Moreover, the EAJA, as a fee-shifting statute in derogation of the common law, must be strictly construed (see <u>Peck v New York State Div. of Hous. &</u>

---

[4] Nor does our interpretation violate the principle of "expressio unius est exclusio alterius" (plurality op at 9). A narrow reading of the EAJA gives the limitation on "any civil action" its intended meaning based on the statute's language.

<u>Community Renewal</u>, 188 AD2d 327, 327-328 [1st Dept 1992]).[5]  The

statute's plain language, with its express limitation on what

constitutes a "civil action" eligible for fees, otherwise

establishes that the statute is not applicable to employment

discrimination actions for compensatory damages.[6]

III.

Despite the Appellate Division majority's belief that

"there is no need to resort to legislative history to discern the

intent of the Legislature" (76 AD3d at 194), it is appropriate to

consider legislative history even where a statute's plain meaning

is clear (see <u>Riley v County of Broome</u>, 95 NY2d 455, 463-64

[2000]).  Such review is particularly appropriate where, as here,

multiple judges have expressed diametrically opposed views of

that "plain meaning."

The legislative history unambiguously supports an

interpretation of the statute as limited to judicial review of

agency action.  The legislature began attempting to pass some

statutory mechanism for providing attorneys' fees to prevailing

---

[5] It is true that "limitations should not be read into . . .
remedial statutes 'unless the limitation[s] proposed [are]
clearly expressed'" (plurality op at 17).  The definition of
"action" in section 8602 (a) clearly expresses such a limitation.

[6] The concurrence argues that the State conceded at oral
argument that the EAJA entitles plaintiff to recover fees for
that portion of her lawsuit that related to her claim for
injunctive relief (concurring op at 2-3).  Any such concession
"is not binding on this Court" (<u>People v Sincerbeaux</u>, 27 NY3d
683, 689 n 3 [2016]).

parties challenging unjust state agency action beginning in 1982. The legislature noted the "tremendous power in [the state's] ability to impose fines, suspend or revoke licenses or compel or restrict the activities of regulated entities" and that suits contesting these actions are extremely costly (Assembly Bill 11940-A [March 1982]). There is no dispute that this version of the bill only applied to review of state agency action. The bill was vetoed in large part because of cost concerns and breadth, as were the similar 1983 and 1984 draft bills.

The 1986 bill, drafted more narrowly than the previous bills, continued to address only state agency action, and again was vetoed, at least in part, because of cost concerns. While these bills over time became increasingly more narrow to address concerns over breadth and cost, the overall purpose remained the same -- reimbursement for costs incurred in challenging state agency action. Although the plurality finds the legislative history of the earlier draft bills indicative of support for a broad interpretation of the EAJA in light of the differences among the previous bills and the final version (plurality op at 20-22), there is no legislative history suggesting a broadening of the bill's applicability in terms of the type of "action" for which fees could be awarded.[7]

---

[7] The Report of the Association of the Bar of the City of New York does not suggest a change in the statute's purpose (see plurality op at 16), but instead discusses the value that the final bill adds by "significantly lowering economic barriers that

Moreover, the legislative history surrounding the passage of the 1989 bill "compels a conclusion that the Legislature intended that the EAJA would be utilized to seek attorneys' fees and expenses in an action that involved judicial review of an administrative action of the State," as the dissent below noted (79 AD3d at 201).  In Governor Cuomo's memorandum of approval of the bill, he commented that the statute "authorize[d] a court to award attorneys' fees to certain plaintiffs or petitioners who prevail in litigation reviewing State *agency action or inaction* when the State's position in the case is not substantially justified . . . .  It is a worthwhile experiment in improving access to justice for individuals and businesses who may not have the resources to sustain a long legal battle against an agency that is acting without justification" (Governor's Approval Mem, Bill Jacket, L 1989, ch 770, at 20 [emphasis added]).  Likewise the bill's sponsor noted that the bill was requested in order to "protect such parties from *unfair agency enforcement actions*" in light of the "prohibitive cost of contesting . . . an action taken against them by a State agency" (Letter from Sponsor, Bill Jacket, L 1989, ch 770, at 6 [emphasis added]).  The "prime Senate sponsor" of the bill acknowledged

---

currently prevent many individuals from contesting irrational an[d] illegal State government action" (Assoc. of the Bar of the City of New York Report, L 1989, ch 770, R 57).  This statement does not evince awareness of an intent to change the types of cases eligible for fees under the EAJA and indeed speaks to reigning in problematic agency action.

that it was intended to provide attorneys' fees for litigants "that were successful in challenging unwarranted state actions" (Letter from Sponsor, Bill Jacket, L 1989, ch 770, at 5). Another letter of support speaks to the bill's purpose in providing "a mechanism for overcoming the economic barriers that frequently prevent poor persons from contesting *erroneous agency actions*" (Letter from New York State Bar Association, Bill Jacket, L 1989, ch 770 [emphasis added]). In fact, the letter relied upon by the Appellate Division majority to support their interpretation stated that "the legislation would provide an incentive to State agencies to reach more considered determinations" (Letter from Sponsor, Bill Jacket, L 1989, ch 770, at 54). These statements would be wholly illogical and inexplicable if plenary actions seeking to recover compensatory damages were eligible for fee awards under the statute.

Striking a similar theme, the Budget Report on Bills submitted to the Governor in opposition to the EAJA stated that the bill's purpose was to allow legal fees "when . . . individuals or entities appeal an unjustifiable ruling of a State agency, board or commission" and that the bill "provides a means of redress for individuals, small businesses, and not-for-profit corporations in situations where a State agency, board or commission is given an unfavorable ruling without good cause" (Budget Report on Bills, A. 3313 [1989]). The arguments in support of the bill recounted in this budget report noted that

the bill "would encourage individuals, small businesses and not-for-profit corporations to seek redress when they feel the State has made a ruling that unjustly affects them" (id.).  This language reflects an understanding of the statute as limited to actions challenging a state agency ruling or determination. While plaintiff argues that the budget report is of no use in determining the statute's goal because it was not before the Assembly or Senate when the bill was passed, the budget report was presented to the Governor before he approved the passage of the bill.  This interpretation of the budget report is also consistent with the letter sent by the bill's sponsor to the Governor after the budget report was issued, noting that the "fiscal impact" of the bill would be minimal "if State agencies are using their *regulatory* powers responsibly and judiciously" (Letter from Robin Schimminger to Governor Cuomo re A. 3313-B, dated September 21, 1989).  As noted above, the Governor in vetoing prior iterations of this legislation was particularly concerned with costs and would certainly have been misled by this budget analysis.

The legislative history demonstrates both the legislature's and Governor's continued concern with the bill's cost.  This concern is borne out by the statute's final product; in particular, section 8604 requires annual reporting describing the "number, nature and amount of each award in the previous fiscal year."  The bill's expected annual cost was less than

$500,000 annually, and its major purpose was to help those "whose rights have been violated but whose potential damage awards may not have been enough to induce lawyers to fight City Hall" (Wittlinger v Wing, 99 NY2d 425, 431 [2003]).  It is difficult to align this concern with plaintiff's $15 million demand for compensatory damages.  Indeed two lawyers, without any apparent expectation of fee recovery from the state, signed contingency fee agreements with plaintiff.

Within all the legislative history over the course of the decade in which the EAJA was contemplated and developed, there is no discussion of a drastic change in the statute's purpose or applicability from its earlier incarnations.  All involved in the 1989 bill's passage assumed it was of limited applicability to judicial review of agency actions and not one statement in the record contradicts that conclusion.

Plaintiff also argues that the federal EAJA supports her interpretation because CPLR 8600 states that the EAJA was intended "to create a mechanism comparable to that in the federal Equal Access to Justice Act."  This argument fails for several reasons.  First, despite the plurality's suggestion that the federal EAJA contains a similar definition of civil action, the federal EAJA in fact uses different language (plurality op at 10-11).  Under the federal statute, the phrase "any civil action" is plainly not limited to those seeking judicial review, as the statute identifies "any civil action" as "including," among other

things, "proceedings for judicial review of agency action" (28

USC § 2412 [d] [1] [A]), necessarily signaling that the phrase

"any civil action" is a broad and inclusive term.  This inclusive

language reflects the broader applicability of that statute, in

comparison with the state version, which limits an award of fees

only to "any civil action or proceeding brought to seek judicial

review" (CPLR 8602 [a]).  We have recognized that "although the

State EAJA purports to be modeled after the Federal act, the

Legislature departed from the Federal model in certain

significant respects" and, thus, the use of different language in

the state EAJA "evinces an intent" to have a stricter or more

narrow statute than the federal counterpart (Matter of New York

State Clinical Lab. Assn. v Kaladjian, 85 NY2d 346, 353 [1995]).

Here, the legislature's choice to depart from the language of the

federal statute reflects a conscious decision to limit the

application of the state EAJA.[8]  Moreover, the federal EAJA would

not apply to plaintiff's claim here, as Title VII includes an

attorneys' fees provision (42 USC § 2000e-5 [k]).

_____

[8] The fact that this language was not in the federal EAJA
when it was first enacted demonstrates how broader language is
necessary to expand the scope of the EAJA.  Moreover, the federal
EAJA is broader than our state version in another manner -- it
allows for recovery by a prevailing party whether the action is
brought "by or against the United States or any agency" (28 USC §
2412 [a] [1]), while our EAJA is limited to only actions "brought
against the state" (CPLR 8601 [a]).  The plurality's decision to
read the State EAJA as "entirely consistent with its federal
counterpart" (plurality op at 11) is not supported by the
language of the statute or our precedent.

The legislature's recent amendment to the Human Rights Law, awarding attorneys' fees to prevailing parties in certain discrimination suits, echoes this federal scheme and further undermines plaintiff's interpretation. The change reflects a legislative belief that, prior to the amendment, fees were not recoverable in gender-based discrimination actions. In fact, the sponsors' memorandum for the amendment is devoid of reference to the EAJA and refers to the fact that "because [the HRL] does not provide for an award of attorneys fees, many plaintiffs are unable to pursue the vindication of their rights" (Sponsors' Mem, L 2015, ch 364). The legislature's understanding at the time of the HRL amendments that individuals in similar situations to plaintiff were not able to recover attorneys' fees for Human Rights Law claims further supports a narrow interpretation of the statute's limitations. Instead, the plurality's opinion opens the door to awards of attorneys' fees in numerous other actions, exclusively against the State, for compensatory damages not contemplated by the holding herein and not subject to fees under the revised provisions of the Human Rights Law.

## IV.

The meaning of article 86 has been plain to courts in this State for the past 28 years. New York courts have applied article 86 only in the context of article 78 proceedings, declaratory judgment actions, and actions for injunctive relief. In more than 70 published cases contemplating article 86, courts

have considered it exclusively in the context of actions seeking

judicial review of agency administrative actions.  For example,

Supreme Court, Erie County granted attorneys' fees to a

petitioner in an article 78 proceeding seeking to annul a

determination of an administrative law judge of the State Office

of Children and Family Service sustaining a maltreatment report

against petitioner (Wright v New York State Office of Children &

Family Servs., 2003 WL 21665633 [Sup Ct Erie County 2003]).

Likewise, the Second Department addressed whether attorneys' fees

were owed to a petitioner in an article 78 proceeding challenging

the termination of petitioner's personal care benefits by the

Westchester County Department of Social Services (Barnett v New

York State Dept. of Soc. Servs., 212 AD2d 696 [2d Dept 2012]).

Similarly, in annual reports issued pursuant to section 8604 from

2004 through 2014, all included awards were granted in cases that

fit this description.  For example, in fiscal year 2014, each of

the reported suits awarding attorneys' fees pursuant to the EAJA

involved a challenge to state agency action (see Letter from

Thomas DiNapoli to Governor Cuomo re Article 86 Report [Nov. 13,

2014]).  These cases demonstrate the type of litigation to which

the statute is intended to apply, in which a plaintiff with

limited resources and a limited potential monetary recovery would

need assistance "fighting City Hall."  During the same period, in

more than 10 annual reports made of fee awards under the EAJA,

there is no record of a single case in which plaintiff attempted

to obtain attorneys' fees under article 86 in a suit seeking predominantly compensatory damages -- until now.

V.

The facts of this case are compelling, both as to the injuries suffered by the plaintiff and the conduct engaged in by the defendant.[9]  But in response the plurality establishes a rule that will have repercussions well beyond awarding fees to this particular plaintiff's attorneys.  The plurality does this in contradiction to the plain meaning of the statute, the unequivocal legislative history, and the interpretation given to the statute by courts and litigants for the past 28 years.  Their motives in doing so are understandable, but the rule created is nevertheless unsupportable.

Accordingly, I dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Judgment appealed from, and order of the Appellate Division insofar as bought up for review, affirmed, with costs.  Opinion by Chief Judge DiFiore.  Judges Rivera and Acosta concur.  Judge Wilson concurs in the result in a separate concurring opinion. Judge Garcia dissents in an opinion in which Judge Stein concurs. Judge Fahey took no part.

Decided May 9, 2017

---

[9] Alternative remedies exist to punish and prevent the dilatory conduct engaged in by the State, including sanctions. In fact, as discussed, State defendants in this case were sanctioned multiple times and settled one such motion by agreeing to pay more than $76,000 in attorneys' fees.