# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 49
In the Matter of Marian T.

Lauren R. et al.,
        Respondents;
Marian T.,
        Appellant.

Cailin Connors Brennan, for appellant.
Douglas A. Eldridge, for respondents.
Autistic Self Advocacy Network et al., amici curiae.

DiFIORE, Chief Judge:

The issue in this adoption proceeding is whether the adoption was categorically precluded because the adoptee, an adult woman with a significant developmental disability, did not have the capacity to give her consent. That issue turns on the proper interpretation of Domestic Relations Law (DRL) § 111(1)(a), which generally requires the consent of an "adoptive child" who is over 14 years old but gives the court discretion to dispense with

- 1 -

that consent. We agree with the Appellate Division that, in appropriate circumstances, the statute permits a court to approve an adoption even absent the consent of an adult adoptee. Because that discretion was not abused here and there is record support for the affirmed best interests finding, we affirm.

Marian T., a 66-year-old woman, has resided with petitioners Lauren M. and Gregg H. for approximately 15 years. Marian has a profound intellectual disability that has resulted in significant developmental delays and limited verbal ability. Petitioners operate a licensed Family Care home under the supervision of the New York State Office for People with Developmental Disabilities, which oversees the placement of individuals with severe intellectual disabilities in private family homes where they may be properly cared for. Seeking to provide permanency for Marian, who has no living relatives and has been in the State's custody since she was a child, petitioners commenced this adoption proceeding in August 2015. Mental Hygiene Legal Services (MHLS),[1] appointed to represent Marian in the proceedings, objected to the adoption on the ground that Marian's consent was required under DRL § 111(1)(a), arguing that Marian lacked the capacity to consent and that the statute permits a court to dispense with adoptee consent only where the adoptee is a child between the ages of 14 and 17. Petitioners countered that, because the phrase "adoptive child" in the statute includes adult adoptees and Marian is over the age of 14, the court had the discretion to dispense with the consent requirement.

---

[1] MHLS is a governmental entity that provides legal assistance to, among others, residents of Family Care homes (*see* Mental Hygiene Law § 47.01[a]).

In an effort to determine Marian's capacity, Surrogate's Court ordered the parties to obtain psychological evaluations of her. Both medical professionals who examined Marian concluded that she is a person with significant developmental disabilities who is nonverbal. In addition, the court interviewed Marian *in camera* to discern her ability to consent and her relationship with petitioners, subsequently appointing a guardian ad litem to further represent Marian's interests in the proceeding. After reviewing the psychological reports and interviewing the parties, the guardian ad litem issued a report stating, among other things, that there was a great deal of love and affection between Marian and petitioners and that, if petitioners demonstrated they were able to assume the financial burden of Marian's care, the adoption should be approved.

A fact-finding hearing followed to assess whether the adoption was in Marian's best interests. Among other evidence, both petitioners testified about their deep emotional attachment to Marian and desire that she be a member of their family. The court agreed with MHLS that it did not have the authority to dispense with Marian's consent under DRL § 111(1)(a) because she was not a "child" but nonetheless approved the adoption. Although the court did not find that Marian possessed the capacity to consent, it concluded that the guardian ad litem had the "implied authority" to consent on Marian's behalf, reasoning that granting the petition promoted Marian's right to be part of a family.[2] Further, the court

---

[2] The court may appoint a guardian ad litem to represent a person with a disability in proceedings in Surrogate's Court (*see* Surrogate's Court Procedure Act § 403[2]). Neither party now challenges the appointment of the guardian ad litem and no claim is made here that the guardian ad litem had the authority to consent on Marian's behalf, an issue we do not address.

deemed the adoption to be in Marian's best interests because she was bonded to and had affection for petitioners, who "sincerely desired to care for her as a member of their family."

The Appellate Division unanimously affirmed the order approving the adoption petition, although it disagreed with the Surrogate's interpretation of DRL § 111(1)(a). The Appellate Division concluded that the statute authorizes a court, in the appropriate exercise of discretion, to dispense with an adult adoptee's consent to the adoption (*Matter of Marian T.*, 166 AD3d 1370, 1371 [3d Dept 2018]). Here, where Marian lacked the capacity to consent, the court concluded that her consent was "unnecessary," rejecting the argument that the absence of adoptee consent categorically precluded the adoption (*id.* at 1373). Finally, the court agreed with the Surrogate's finding that the adoption was in Marian's best interests. We granted leave to appeal (32 NY3d 919 [2019]) and we now affirm.

The primary issue in this case is one of pure statutory interpretation: whether DRL § 111(1)(a), which requires the consent of an "adoptive child" over the age of 14, authorizes a court to exercise its discretion in appropriate circumstances to dispense with the consent of an adoptee who is over the age of 18. In MHLS' view, the statute generally requires the consent of all adoptees over the age of 14, but permits a court to dispense with that consent only if the adoptee is a "child" (*i.e.*, a minor between the ages of 14 and 17) and only if the adoptee would be harmed by learning that the proposed adoptive parents are not the adoptee's biological parents, a concern reflected in the statute's legislative history. Petitioners assert that, on its face, the statute allows courts to dispense with adoptee consent

in the sound exercise of discretion, even when the adoptee is over the age 18.  We agree with petitioners.

"When presented with a question of statutory interpretation, a court's primary consideration is to ascertain and give effect to the intention of the Legislature" (*Lemma v Nassau County Police Officer Indem. Bd.*, 31 NY3d 524, 528 [2018] [internal quotation marks omitted], quoting *Riley v County of Broome*, 95 NY2d 455, 463 [2000]). Because "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). "When the statutory language at issue is but one component in a larger statutory scheme, it must be analyzed in context and in a manner that harmonizes the related provisions and renders them compatible" (*Matter of Mestecky v City of New York*, 30 NY3d 243, 243 [2017] [internal quotation marks and citations omitted]).

Certain consents are needed for an adoption to proceed and section 111 of the DRL sets forth who must consent to an adoption under various circumstances.  Relevant to this case, subsection (1)(a) provides that consent is required "[o]f the adoptive child, if over fourteen years of age, unless the judge or surrogate in his discretion dispenses with such consent" (DRL § 111[1][a]).  "Adoptive child" is a term of art defined in the statutory scheme to mean "a person adopted" (DRL § 109 [Definitions]).  The phrase "a person adopted" contains no age restriction—clearly encompassing both minors and adults (*id.*). That the Legislature intended the phrase "adoptive child" to encompass not only minors but also adult adoptees is further illustrated by the Legislature's use of phrase in a different

subsection of the same statute in a manner that clearly refers to adoptees over the age of 18 (*see* DRL § 111[4] ["(w)here the adoptive child is over the age of eighteen years . . ."]).

Indeed, the adoption of an adult has been expressly permitted by statute since at least 1915, providing a means of legally formalizing a parent-child relationship (*see Matter of Robert Paul P.*, 63 NY2d 233, 237 [1984], citing L 1915, ch 352; *see also* DRL § 110 [providing that an adult may adopt "another person" and containing no restriction on the age of the adoptee]).  Like an adoption involving a minor, "an adult adoption must still be in the best interests of the adoptive child and the familial, social, religious, emotional and financial circumstances of the adoptive parents which may be relevant must still be investigated" (*Matter of Robert Paul P.*, 63 NY2d at 237 [internal quotation marks, alterations and citations omitted]).  In other words, the fact that the adoptee is an adult does not significantly alter or "dilute" the legislative purpose underlying the adoption statutes or the standards that must be met to grant an adoption.  Although in other contexts the term "child" may refer to an individual under the age of majority, it is evident that in this statute the word "child" refers not to the age of the adoptee but the nature of the filial relationship between the party seeking to adopt and the person being adopted (*see generally Robert Paul P.*, 63 NY2d 233).[3]  Thus, it is clear from the text of DRL §§ 111(1)(a) and 109 that

---

[3] *Matter of Robert Paul P.*, our most recent adult adoption precedent, is a product of another time in the sense that the injustice motivating the petition in that case -- the inability to obtain legal recognition of a same-sex romantic relationship – has since been rectified.  We cite the case for the enduring propositions that the relationship created by adoption is one of parent and child, even when the adoptee is an adult (supporting our conclusion that the term "adoptive child" encompasses an adult), and that the same basic standards govern adult adoption.  As noted by the dissent (dissenting op, at 5 n 2), DRL § 110 was amended in 2010 to permit "any two unmarried adult intimate partners together" to adopt another

the statute requires the consent of any adoptee over the age of 14 but gives courts the discretion to dispense with that consent in appropriate circumstances.

MHLS and the dissent rely on certain legislative history to assert that the Legislature intended to authorize judges to dispense with consent of minor adoptees in only one circumstance—where knowledge of the adoption proceeding and discovery that the putative adoptive parents are not the child's biological parents would psychologically damage the child. The language permitting a court to dispense with adoptee consent was added to the statute in 1942 and the accompanying bill jacket includes statements in support of the amendment, submitted by various interested parties, noting that it would give courts discretionary authority to dispense with adoptee consent in such a circumstance (*see* Mem from NY County Lawyers' Association, March 3, 1942, Bill Jacket, L 1942, ch 118 at 4-5; Letter from George Xanthaky to the Governor, March 16, 1942, Bill Jacket, L 1942, ch 118 at 8). From this we can infer that the Legislature understood that the statute would permit courts to grant adoption petitions in the absence of adoptee consent when appropriate to avoid psychological harm to a child who was unaware of the adoption proceedings. However, the statutory language does not restrict the scope of the court's

_____

person (*see* L 2010, ch 509)—a welcome statutory change that codified our holding in *Matter of Jacob* (86 NY2d 651 [1995]). This did not alter the core holding of *Matter of Robert Paul P.* that intimate sexual partners may not adopt one another because adoption's "basic function" is to "giv[e] legal effect to a parent-child relationship"— not to create a legal status for parties involved in a romantic relationship (63 NY2d at 237-238). This is reflected in DRL § 110, which describes adoption as a process "whereby a person takes another person into the relation of child," acquiring "the rights and . . . responsibilities of parent in respect [to] such other person" – language that was not amended by the Marriage Equality Act of 2011, also invoked by the dissent, which addresses the relation of marriage.

discretion to dispense with adoptee consent—let alone reflect an intent to limit the exercise of such discretion to the particular circumstance identified by MHLS. Had the Legislature intended to limit judicial discretion in that manner, it would have said so in the statute.

Moreover, MHLS' interpretation of DRL § 111(1)(a) would categorically preclude the adoption of adults who lack the capacity to consent.[4] But there is no basis to conclude that the Legislature intended to deny any group of people the benefits of adoption, permitting fulfillment of the right to a loving, legally-recognized familial relationship and the attendant stability of a permanent home. Nevertheless, MHLS asserts that construing the statute to allow courts to dispense with adult adoptee consent leads to absurd results— "surprise" adoption proceedings in which, for no legitimate reason, competent adult adoptees are deprived of notice of their own adoptions or are adopted over their objection. It is always possible to imagine scenarios where judicial discretion could be abused or even

_____

[4] By interpreting the statutory language as written by the Legislature and reviewing whether discretion was abused in this particular case, we do not suggest that it is always appropriate to dispense with consent in cases involving adoptees over the age of 14 who are unable to consent. Unlike our concurring colleague, we make no distinction based on class (*see* concurring op at 5 [where consent is "an impossibility [due to lack of capacity], the condition precedent [of adoptee consent] should not be enforced"]). The statute permits a court to dispense with consent only in the sound exercise of judicial discretion. Whether that discretion is appropriately exercised in other cases will depend on all the facts presented and the arguments raised by the parties. Contrary to the view expressed in the dissent, that the Legislature did not codify the circumstances in which courts may appropriately exercise their discretion by specifically referencing adoptees with developmental disabilities does not constitute a "gap" in the statutory scheme (dissenting op, at 2-3)—it reflects a legislative determination that courts are in the best position to consider, based on the unique circumstances involved in each case, whether to dispense with adoptee consent.

exercised in an unconstitutional manner,[5] but this is not a basis to read discretion out of the statute, interpreting the text contrary to its plain language. The dissent does just that when it reads the statute only to "authorize[] courts to dispense with consent in limited circumstances to protect the wellbeing of an adolescent over age 14 and under 18 years of age" – imposing conditions never adopted by the Legislature. Ironically, we are accused of redrafting the statute (dissenting op at 17) – when we interpret the statute as written, without embellishment, based on terms defined by the Legislature.

Here, the Appellate Division correctly concluded that DRL § 111(1)(a) provided express statutory authority to dispense with Marian's consent and the court did not abuse its discretion when it determined that her inability to consent should not prevent this adoption (*see Sadek v Wesley*, 27 NY3d 982, 983 [2016], citing *Brady v Ottoway Newspapers.*, 63 NY2d 1031, 1032 [1984]). Marian T. was given notice of the adoption petition and significant efforts were made to involve her in the process to the extent possible, ensuring that her rights and interests were fully protected. These efforts are reflected in the extensive record developed in Surrogate's Court in which Marian's capacity to consent and her feelings and desires (including her ably-communicated desire to remain in petitioners' care) were explored through multiple psychological evaluations, an *in camera* interview and the appointment of a guardian ad litem. Under these

---

[5] Our concurring colleague puts his imagination to such use here, addressing various arguments neither preserved nor presented in this case. Because no constitutional issues were raised by the parties there is no occasion to consider the applicability, in the adoption context, of the cases cited in the concurrence and dissent involving the liberty interests of parents vis-à-vis their children.

circumstances, the Appellate Division did not abuse its discretion in determining it was appropriate to dispense with Marian T.'s consent, as the statute permits.[6]

Finally, there is record support for the affirmed finding that adoption is in Marian's best interests. There was evidence of petitioners' strong filial affection for Marian and her love for them, and that she was safe and well-cared for in their home, a setting in which she has thrived. Further, the record supports the affirmed finding that the adoption would leave Marian in a comparable financial position as before, without significantly altering her eligibility for critical services.

Accordingly, the Appellate Division order should be affirmed, without costs.

---

[6] To the extent the Appellate Division decision can be read as conflating the issue of consent with the best interests analysis courts must undertake before granting any adoption petition (*see* DRL §§ 114[1], 116[4]; *see also Matter of Robert Paul P.*, 63 NY2d at 237), we clarify that whether the necessary consent requirements have been fulfilled and whether the adoption serves the best interests of the adoptee are separate considerations (*see Caban v Mohammed*, 441 US 380, 387 [1979] ["[T]he New York Court of Appeals has stated unequivocally that the question whether consent is required is entirely separate from that of the best interests of the child"], citing *Matter of Corey L. v Martin L.*, 45 NY2d 383, 391 [1978] ["(W)hile promotion of the best interests of the child is essential to ultimate approval of the adoption application, such interests cannot act as a substitute for a finding of abandonment," rendering an unwed father's consent unnecessary]). The concurrence is mistaken insofar as it suggests that a court can dispense with the consent needed for an adoption based solely on a best interests finding (*see* concurring op at 2). Here, it is evident that the Appellate Division had a basis for dispensing with Marian's consent, readily ascertainable from the record, which involved an inquiry distinct from the standard best interests analysis.

WILSON, J. (concurring):

Although I agree with Judge Rivera's analysis of the 1942 amendment to section 111 (a) of the Domestic Relations Law and her emphasis on recognizing that Marian T. is an adult, not a child, I concur in the result on the facts of this case.

This is purely a case of statutory interpretation, but not a simple one. If it were, the majority opinion would be three lines long, pointing out that the Domestic Relations Law literally and unambiguously permits the adoption of any person without the adoptee's consent: consent is not required from persons under 14, and a court may dispense with consent for everyone else. The majority's unspoken but necessary concession is that the statute cannot be read as written.

In pertinent part, the Domestic Relations Law states: "An adult unmarried person or an adult husband and his adult wife together may adopt another person" (§ 110), and "consent to adoption shall be required . . . [o]f the adoptive child, if over fourteen years of age, unless the judge or surrogate in his discretion dispenses with such consent" (§ 111 [1]). Read literally, the statute permits Kim Kardashian and Kanye West to adopt me over my strenuous objection, so long as a judge determines that would be in my best interest. The judge might well be right in so concluding. Nevertheless, that construction would be plainly unconstitutional; I have a fundamental liberty interest of personal choice in my familial relationships (*see, e.g., Santosky v Kramer*, 455 US 745, 753 [1982]; *Cleveland Bd. of Educ. v LaFleur*, 414 US 632, 639 [1974]). Because we cannot interpret the statute as written, we must construe it in a way that avoids unconstitutionality (*H. Kauffman & Sons Saddlery Co. v Miller*, 298 NY 38, 44 [1948] ["Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results"]; *see also Matter of Malpica-Orsini*, 36 NY2d 568, 570 [1975], *overruled on other grounds by Caban v Mohammed*,

441 US 380 [1979] ["(O)nly as a last resort will courts strike down legislative enactments on the ground of unconstitutionality"]).

Neither the majority nor the dissent can point to any legislative history showing that the legislature considered what to do when a prospective adult adoptee is unable to give or refuse consent. The majority contends that limiting the court's ability to dispense with consent to persons under age 18 would prevent the adoption of all adults with a profound intellectual disability, but can point to no consideration by the legislature of that issue. Judge Rivera quite convincingly demonstrates that the legislature, when amending section 111 (1) to allow a judge to dispense with the adoptee's consent, had in mind adoptees under age 18 – not adults.[1] But that does not answer the question of what the legislature intended as to adults who are incapable of giving consent because of a profound intellectual disability. Judge Rivera also relies on section 111 (2) (d), which dispenses with consent of a parent with a profound intellectual disability, as evidence that the legislature knew how to describe such a condition (albeit in retrograde terminology), but that, again, does not evidence the legislature's consideration of what to do in a situation when the prospective adult adoptee is incapable of giving consent.

---

[1] Pairing the amendment with the observation that adoption is in derogation of the common law (*see* dissent at 4–5) does not bear on the legislature's intent, because the legislature, over time, has completely abrogated the common law, eventually providing that any adult may adopt any other person (and in some cases, even a minor may adopt another person) (Domestic Relations Law § 110). Thus, there is now no reason to conclude that the 1942 amendment should be read against a background in which adoption is disfavored; the legislature has subsequently completely eviscerated that aspect of the common law.

I am left, then, with the firm conclusion that the legislature has never thought about the issue presented here: if a prospective adult adoptee is unable to give or refuse consent because of a profound intellectual disability, may the adoption proceed and, if so, what is required?  My conclusion reinforces Judge Rivera's observation that the legislature should carefully consider the question, because adults with disabilities are not children, though they may benefit from adoption in some circumstances, not in others, and may in yet other cases need some statutory treatment other than adoption or guardianship.[2]  Although the circumstances here may seem unusual, one can easily imagine circumstances in which, for example, a parent of an adult with an intellectual disability wishes to have his or her partner adopt that child.

In the absence of any legislative guidance, faced with the need to construe a statute that, if read literally, would be plainly unconstitutional, I would conclude that the overall legislative scheme assumes that, where consent is required, there is the possibility of it being granted or denied.  For example, where an intellectually disabled parent cannot consent to a child's adoption, the Domestic Relations Law dispenses with consent (§ 111 [2] [d]).  Where a parent has disappeared (§111 [2] [a]), or where a parent no longer has the ability to consent because the parent has been displaced by a guardian (§ 111 [2] [c]), or where the consent of "any person or authorized agency having lawful custody" of

---

[2] Although the Surrogate's Court laudibly attempted to assess Marian's wishes, this case demonstrates the need for clearer guidance from the legislature on how courts should support people with disabilities to participate meaningfully in legal proceedings and exercise their right to make choices about their lives and families (*see generally* Kristin Booth Glen, *Changing Paradigms: Mental Capacity, Legal Capacity, Guardianship, and Beyond*, 44 Colum Hum Rts L Rev 93 [2012]).

an "adoptive child [] over the age of eighteen years . . . cannot for any reason be obtained (§ 111 [2] [f], [4]), the Domestic Relations Law dispenses with consent.  Thus, I would not interpret Domestic Relations Law section 111 (a) to impose a condition in a circumstance where it cannot be met.

I admit that the statutory interpretation here presents a close call with no obviously correct answer, but unforeseen events that make a condition impossible to meet generally are viewed as excusing the condition, as set out in the ancient doctrine of *lex not cogit impossibilia* – the law does not require impossibilities (*see generally People ex rel. Nugent v Board of Police Commissioners,* 114 NY 245, 250–251 [1889]; *Stewart v Stone*, 127 NY 500, 507 [1891]; *Hirshfeld v Fitzgerald*, 157 NY 166, 185 [1898]; *In re Scott's Will*, 8 NY2d 419, 426–427 [1960];  McKinney's Cons Laws of New York Statutes § 141 ["The court will not interpret a statute to require an impossibility"]).  Here, as we cannot disturb the factual determination that Marian's consent was an impossibility, the condition precedent should not be enforced.  Because there is no basis on this record to overturn the finding that the proposed adoption would be in her best interest, I concur in the result.

RIVERA, J. (dissenting):

Petitioners commenced this proceeding seeking to adopt respondent, an unrelated adult female living in petitioners' family care home. Mental Hygiene Legal Services (MHLS) represents respondent in the adoption proceeding, and argues that, for respondent

- 1 -

to be adopted, she must consent to be adopted. MHLS further contends that Surrogate's Court may not dispense with this requirement solely because respondent is unable to provide informed consent due to her intellectual limitations. The lower courts rejected this position.

I agree with the majority that, as a threshold matter, the Domestic Relations Law expressly requires an adult to consent to their adoption. But I part ways with the majority to the extent that it determines courts have discretion to dispense with this requirement "in appropriate circumstances" (majority op at 7). According to the majority, appropriate circumstances exist here because respondent is unable to provide legal consent due to her "intellectual disability" (*id.* at 2). That conclusion is not supported by the controlling statute's text or legislative history. Rather, the statutory requirement applies to all persons over the age of 14 capable of consenting. Under no circumstance may a court dispense with an adult's consent to be adopted.

Respondent is not a child; she is an adult and should be treated as such. Whether the State should permit adoption of individuals incapable of consent due to intellectual limitations is an evolving question that requires consideration of an adult individual's right to self-determination and autonomy, regardless of their capacity to consent. The governmental body constitutionally authorized and best suited to weigh the difficult policy issues central to that choice is the legislature, not this Court. In its attempt to fill a statutory gap, the majority has exceeded our authority and crossed the line from interpreting to redrafting the statute. I dissent.

I.

The facts are mostly undisputed. Petitioners run a family care home for individuals with disabilities under the auspices of the Office of People with Developmental Disabilities. In 2015, they petitioned to adopt respondent, who has lived with them since 2005. Respondent is a 66-year old adult with intellectual limitations that the courts below determined render her incapable of consenting to the adoption.[1]

Surrogate's Court determined that it lacked authority to dispense with the statutory requirement that respondent consent to the adoption. Rather than dismiss the petition, the court appointed a guardian ad litem, and thereafter concluded the guardian could and did provide implied consent. On the merits, the court found that adoption by petitioners was in respondent's best interests and granted the petition. The Appellate Division affirmed the adoption order, concluding that consent was required and although the guardian could not consent on respondent's behalf, the law authorized Surrogate's Court to dispense with consent. The court ultimately held that "because the adoption is in respondent's best interests, but she is unable to consent, her consent was unnecessary and, as such [] the adoption was properly approved" (*Matter of Marian T. [Lauren R.]*, 166 AD3d 1370, 1373 [3d Dept 2018]).

---

[1] Respondent's capacity to consent is disputed. Petitioners contend that respondent signed the adoption petition and that her psychologist concluded that respondent has the capacity to consent and has consented to adoption by petitioners. MHLS argues that respondent is incapable of providing informed consent. I assume for purposes of my analysis that the record supports the decisions below that respondent is incapable of consenting to the adoption based on her intellectual limitations.

For the reasons discussed by the majority, an adult's consent to the adoption is a precondition to a court's best interests analysis, and the Appellate Division conflated the two (majority op at 10 n 6; *see also Caban v Mohammed*, 441 US 380, 387 [1979] ["(T)he New York Court of Appeals has stated unequivocally that the question whether consent is required (under Domestic Relations Law § 111) is entirely separate from that of the best interests of the child"], citing *Corey L. v Martin L.*, 45 NY2d 383, 390 [1978]). Because respondent cannot consent, the adoption petition should have been dismissed. Therefore, I would reverse the Appellate Division.

## II.

## A.

"As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*People v Golo*, 26 NY3d 358, 361 [2015], quoting *Majewski v Broadalbin–Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). Because adoption reflects a legal relationship unknown to our common law, "[w]hat is to be construed strictly and applied rigorously in this sensitive area of the law . . . is legislative purpose as well as legislative language" (*Matter of Jacob*, 86 NY2d 651, 657 [1995]; *accord* McKinney's Cons Laws of NY, Book 1, Statutes § 301, Comment *a* ["(S)tatutes in derogation or in contravention (of the common law), are strictly construed, to the end that the common law system be changed only so far as required by the words of the act and the mischief to be remedied"]; *see also* John Francis Brosnan, Law of Adoption, 22 Colum L Rev 332 [1922] ["(T)he adoption of adults, permitted since 1915 by the statute, (was) a radical and

sweeping departure from the whole theory of adoption as formerly recognized in this state—the theory of giving to a child a home and a parent"]). Accordingly, in interpreting the statute, it is appropriate here to "follow the course of [the] legislation" to "illuminate the intent of the legislature" (*People v Litto*, 8 NY3d 692, 697 [2007], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 124).

### B.

"On few questions is decisional law so clear as on this: that adoption [] is, in New York, solely the creature of, and regulated by, statute law" (*Matter of Eaton*, 305 NY 162, 165 [1953] [citation omitted]). "The [l]egislature has supreme control over the subject [and s]ince adoption is purely a statutory matter, the answer to the question of what consents are necessary must be found in the statutory provisions" (*Matter of Malpica-Orsini*, 36 NY2d 568, 570 [1975], *overruled on other grounds by Caban v Mohammed*, 441 US 380 [1979]).[2]

---

[2] The majority cites—unnecessarily, in my view—*Matter of Robert Paul P.* (63 NY2d 233 [1984]), a case wherein a 4-2 majority held that an adult could not adopt a same-sex romantic partner (majority op at 6). It bears noting that the practice of attempted adoptions of same-sex partners emerged at a time when individuals in same-sex relationships were "outlaw[s] . . . truly strangers to the law—shoved out of every legal system" (Elon Green, *The Lost History of Gay Adult Adoption*, NY Times, Nov. 27, 2013; *see also* Koa Beck, *How Marriage Inequality Prompts Gay Partners to Adopt One Another*, The Atlantic [Nov. 27, 2013] ["Because of historical opposition to gay marriage, long-term, same-sex couples have a history of adopting one another for legal protection"]). With the 2010 amendment of Domestic Relations Law § 110 to permit "two unmarried adult intimate partners" to adopt another person, as well as with enactment of the Marriage Equality Act by the legislature in 2011, which legally recognized same-sex marriage, it is now decidedly clear that New York recognizes the right of same-sex partners to equal treatment under the law in the formation of marital and familial relations (*see* L 2011, ch 94, § 2 ["Marriage is a fundamental human right. Same-sex couples should have the same access as others to the protections, responsibilities, rights, obligations, and benefits of civil marriage. *Stable family relationships help build a stronger society*" (emphasis added)]; *see also Obergefell v Hodges*, 576 US 644, 670 [2015] ["The States have contributed to the fundamental

As relevant here, Domestic Relations Law Article 7, section 111, titled "Whose Consent Required," provides in subdivision (1) (a) that, subject to further limitations not relevant here, "consent to adoption shall be required . . . [of] the adoptive child, if over fourteen years of age, unless the judge or surrogate in [their] discretion dispenses with such consent." Subdivision 3 (a) provides that "[n]otice of the proposed adoption shall be given to a person whose consent to adoption is required pursuant to subdivision one and who has not already provided such consent."[3]

---

character of the marriage right by placing that institution at the center of so many facets of the legal and social order"]). Granted, as the majority notes, the legislature did not reject *Matter of Robert Paul P.*'s "core" holding that adoption is a means to establish a parent-child relationship (*see* majority op at 7 n 3; Domestic Relations Law § 100.10 ["Adoption is the legal proceeding whereby a person takes another person into *the relation of child and* thereby acquires the rights and incurs the responsibilities of *parent*"] (emphasis added)]; Alan D. Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Domestic Relations Law C110:1 ["The adoption statutes permit the relationship of parent and child to be created by operation of law"], citing *Matter of Robert Paul P.*, 62 NY2d 233 [1984]). But, the legislature did abolish the previous legally-sanctioned unequal treatment of same-sex couples—thus, affirming a commitment to equality regardless of gender and sexuality and rendering it unnecessary in New York for same sex partners to use adoption as a means to acquire the rights and recognition associated with marriage. To the extent that the reasoning of *Matter of Robert Paul P.* may be considered contrary to the principles of equal protection and human dignity reflected in our state legislation, the case is best left in the past. And, of course, we need look no further than the Domestic Relations Law to support the proposition that adoption's "basic function" is to "give legal effect to a parent-child relationship" (majority op at 7 n 3).

[3] Subdivision 3 continues:

> "(b) Notice and an opportunity to be heard upon the proposed adoption may be afforded to a parent whose consent to adoption may not be required pursuant to subdivision two, if the judge or surrogate so orders.
>
> "(c) Notice under this subdivision shall be given in such manner as the judge or surrogate may direct.

Section 111 (4) directs that,

> "[w]here the adoptive child is over the age of eighteen years the consents specified in paragraphs (b), (c) and (d) of subdivision one of this section shall not be required, and the judge or surrogate in [their] discretion may direct that the consent specified in paragraph (f) of subdivision one of this section shall not be required if in [their] opinion the best interests of the adoptive child will be promoted by the adoption and such consent cannot for any reason be obtained" (Domestic Relations Law § 111 [4]).

Section 111 (f) requires the consent of "any person or authorized agency having lawful custody of the adoptive child."

By its plain language, section 111 requires consent of an adoptive child over the age of 14, but the statute provides no guidance as to why the legislature chose an age range that includes both minors and adults. In contrast, section 111 (4) disposes automatically with the statutory consents of the third parties specified in subdivisions (b), (c) and (d) for adoptees over the age of 18, the age of majority (*see* Domestic Relations Law § 2 ["A 'minor' or 'infant,' as used in this chapter, is a person under the age of eighteen years"]).[4] This would suggest a legislative recognition of adult autonomy and an intent to reaffirm

---

> "(d) Notwithstanding any other provision of law, neither the notice of a proposed adoption nor any process in such proceeding shall be required to contain the name of the person or persons seeking to adopt the child" (Domestic Relations Law § 111 [3] [b]-[d]).

[4] Although the age of majority has been set at age 18, there are certain circumstance where legal rights or restrictions continue to age 21, which had been the age of majority for all purposes until 1974. For example, "[a]s a matter of policy, the [l]egislature has provided that the parents of a child remain chargeable for the child's support until age 21" (Alan D. Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Domestic Relations Law § 111, citing, Family Court Act § 413; Social Services Law § 2 [31]).

that consent is indispensable to an adult adoption. And yet section 111 (1) (a) appears to empower a court to dispense with that consent, which, in turn, allows for an adoption proceeding without notice to an adult who is the subject of the petition and further authorizes a court to order an adoption over that adult's objection. This appears an absurd result on its face and must be avoided to preserve the integrity of the adoption framework (*see People v Garson*, 6 NY3d 604, 614 [2006] ["(C)ourts are governed by the principle that we must interpret a statute so as to avoid an unreasonable or absurd application of the law" (internal quotation marks omitted), quoting *People v Pabon*, 28 NY3d 147, 156 (2016)]; *Matter of DeTroia v Schweitzer*, 87 NY2d 338, 342 [1996] [stating that an ordinance "should be interpreted to avoid this objectionable, absurd, anomalous and unjust result"]; McKinney's Cons Laws of NY, Book 1, Statutes § 145, Comment ["An intent patently absurd is not to be attributed to the Legislature, and it will be presumed that the Legislature did not intend an absurd result to ensue from the legislation enacted"]).

The Court has previously recognized that because the Domestic Relations Law applies to both adults and minors we must carefully scrutinize the respective provisions at issue to determine whether the legislature intended to narrow its application to any particular age group (*see Matter of Eaton*, 305 NY at 166). Here, the statutory text alone does not shed light on the legislative intent. The implication of the different treatment of adoptees over fourteen years old and those over 18 years old thus requires reference to the legislative history of section 111 (1) (a) (*see Matter of Shannon*, 25 NY3d 345, 351-352 [2015] [turning to the legislative history after determining that the text of the statute was ambiguous]; *People v Ballman*, 15 NY3d 68, 72 [2010] [same]; *Matter of Action Elec.*

*Contrs. Co. v Goldin*, 64 NY2d 213, 221 [1984] [same]). That history makes clear that the legislature did not intend to authorize courts to dispense with an adult's consent. As I discuss, section 111 (1) (a) was enacted for a narrow purpose—to avoid potential trauma to  adolescent adoptees over the age of 14 and only in limited circumstances.

C.

New York first recognized the relationship of a parent and child created by statute in 1873 (L 1873, ch 830 [defining adoption as "(t)he legal act whereby an adult person takes a minor into relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect to such minor"]). By 1915, the Domestic Relations Law was amended to provide for "an adult" to "adopt a person of the age of twenty-one years and upwards" (L 1915, ch 352). At present, the statute permits an "adult [] person" to "adopt another person" (Domestic Relations Law § 110; *see also* Domestic Relations Law § 109 [1] ["'Adoptive parent' or 'adoptor' shall mean a person adopting and 'adoptive child' or 'adoptee' shall mean a person adopted"]).

Before the legislature amended the Domestic Relations Law in 1942, the statute required the consent of all adoptees over the age of 14 (Mem from George Xanthaky for the Governor, March 16, 1942, Bill Jacket, L 1942, ch 118 at 8).[5] A memorandum from

---

[5] The majority's qualification concerning the legislative history is puzzling. This Court regularly cites to statements "submitted by non-legislators" (majority op at 7), including the Governor's Office, to understand the legislature's intent (*see e.g. Kimmel v State*, 29 NY3d 386, 397 [2017] ["The legislative history from 1989, when the (Equal Access to Justice Act) became law, demonstrates that the EAJA was 'targeted at those businesses and individuals . . . who often lack the resources necessary to vindicate their civil and legal rights'"], quoting  Letter from New York Lawyers for the Public Interest, Inc., Bill Jacket, L 1989, ch 770 at 46; *Mestecky v City of New York*, 30 NY3d 239, 245-246 [2017] [citing

assistant counsel to the governor notes that surrogates had reported instances of adoptees who had lived with adoptive parents with no knowledge that the adoptive parents were not biological kin (*id.*; *accord* Report No. 243, New York County Lawyers Association, Committee on State Legislation, Bill Jacket, 1942 ch 118, at 4-5). Thus, the enactment was viewed as endowing the judge with the discretion to "dispense with the consent in such cases as [the judge] deems proper" (Xanthaky Mem, at 8). The Report of the New York County Lawyers Association describes the bill similarly.

> "[T]he Domestic Relations Law now allows the Judge or Surrogate in the case of the adoption of a child over the age of eighteen years to dispense with the consent of . . . the surviving parent of a child born in wedlock, the mother of a child born out of wedlock, or the person or authorized agency having lawful custody of the [adoptee], if, in the judgment of the said Judge or Surrogate, the moral and temporal interests of the foster child will be promoted by the adoption and such consents cannot for any reason be obtained. Again[,] where the [adoptee] is an adult, the consents of the persons just enumerated are not required.
>
> "Therefore, there seems to be no reason for requiring in a proper case, the consent to its adoption of an infant over the age of fourteen years. The Judge or Surrogate before whom the adoption is pending, always considers each case on its own particular merits, and as adoptions are now legally handled, full investigations are made under the direction of the Judge or Surrogate before the matter comes up for decision. As a result, the Court is always fully advised of the actual facts, and can readily determine if the nature, or even the pendency of the proceeding, should be made known to the child. If, as is always the case, where the adoption is allowed, the adoption is for the best interest of the child, there seems to be no reason why a

---

a governor's approval memorandum, a letter from New York City Mayor Edward Koch, and a letter from President of the Borough of Queen to support the Court's interpretation of the New York City Charter]).

child who perhaps has been taken into the family of the [adoptive parent] when a mere baby, or at a very tender age, should be suddenly confronted with the fact that those whom it has looked upon as its parents, are not in fact, its father or mother, as the case may be. The welfare of the child morally and temporally will, it seems, be best served by leaving its adoption solely to the discretion of the court, unless the Court itself feels that the child should in a particular case have knowledge of the proceeding for its adoption, and should formally consent thereto, if it is over fourteen years of age" (Report No. 243 at 4-5).

Furthermore, a letter from the Surrogate's Court of the County of New York to the Office of the Governor recounts similar incidences of surprise for adoptees over the age of 14 who had no knowledge that the adoptive parent was not their biological parent due to the consent requirement. It notes that "[i]n many such cases the knowledge thus imparted to the child in adolescence [caused] a very bad reaction" (*id.* at 7). The letter concluded that the power to dispense with consent "will only be used where obtaining the consent would be harmful to the child" (*id.*).

This history makes plain that the legislature resolved concerns about the potential impact of an adoption on some adolescents over 14 years of age by authorizing a court to dispense with consent under appropriate circumstances. Nothing in the history reveals any other animating concern. Put another way, the history indicates that the motivation for amending the statute was to avoid possible trauma to an adolescent adoptee over 14 years of age where the adolescent was unaware that the person raising them was not their biological parent. As the bench and bar explained to the legislature, knowledge of that fact was potentially harmful to some adolescents unable to process such a revelation. That concern has no similar application in an adult adoption. Nor is there mention in the history

of any reason, and the majority provides none, for why the legislature sought to empower a court to dispense with consent in an adult adoption. For almost three decades before this amendment the statute required consent of an adult without limitation. If elected officials, the bench and bar thought it was time to limit the rights of adults in adoption proceedings, we would expect them to debate the issue publicly, and not, as the majority assumes, act without apparent cause. Surely, the legislature could not have intended a dramatic change in the law—one that limited the rights of adults *sub silentio*—without, at a minimum, consideration of the constitutionality of such action (*see Cleveland Bd. of Educ. v LaFleur*, 414 US 632, 639-640 [1974] [recognizing that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"]; *see also Matter of Martin F*., 13 Misc 3d 659, 673 [Fam Ct, Monroe County 2006] ["The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they . . . (placed) custody of their child (with) the State"], quoting *Santosky v Kramer*, 455 US 745, 753 [1982]).

The legislative history leads to only one logical interpretation of the statutory language. The legislature left unchanged the mandatory requirement of consent by adoptive persons over the age of 14, but authorized courts to dispense with consent in limited circumstances to protect the wellbeing of an adolescent over age 14 and under 18 years of age.

III.

Apart from the lack of historical support for the majority's alternative interpretation of section 111(1)(a), the proposed reading is internally inconsistent. The majority

concludes that 111 (1) (a) requires consent and that a court may dispense with that consent even in the case of an adult. But this conclusion implies that dispensing with consent for an adult capable of giving consent would be an abuse of discretion or unconstitutional (majority op at 7). Essentially, the majority holds that the only classes of potential adoptees whose consent may be dispensed with are adolescents over 14 years old and adults incapable of consenting because of intellectual limitations. But respondent and other adults with intellectual limitations are not children, and we should not equate them as such under the law. Individuals with intellectual limitations are entitled to be treated with the same dignity as any other adult (*see* GA Res 61/206 Convention on the Rights of Persons with Disabilities, Art 12 [Dec 13, 2006] [recognizing that "persons with disabilities have the right to recognition () as persons before the law"]; Kristin Booth Glen, *Piloting Personhood: Reflections from the First Year of a Supported Decision-Making Project*, 39 Cardozo L Rev 495, 496-497 [2017]).

Moreover, section 111 makes a single reference to "intellectual disability"—that of the adoptive "parent or of any other person having custody of the child" (Domestic Relations Law § 111 [2] [d]). This illustrates that the legislature knew how to make distinctions based on intellectual limitations. Therefore, if the legislature intended the majority's interpretation, it knew how to amend the statute to achieve that end and would have expressly done so. It did not and we may not redraft the statute to achieve an outcome unaddressed or not intended by our elected officials (*see e.g. Matter of Kosmider v Whitney*, 34 NY3d 48, 58 [2019]; *Xiang Fu He v Troon Mgt., Inc.*, 34 NY3d 167, 173 [2019]; *Matter of Orens v Novello*, 99 NY2d 180, 189 [2002]).

The majority justifies this carveout, advocated by petitioners, by arguing that a contrary interpretation of section 111 would unfairly categorically bar the adoption of adults who lack the capacity to consent and deny them the benefits of adoption. This view misunderstands antidiscrimination theory. What would be discriminatory and unjust would be to treat respondent and adults with intellectual limitations differently from all other adults—including subjecting them to new familial relationships, imposed without their consent—under a law designed for those who can consent. The majority cannot overcome this inherent constraint of the statute with an interpretation that allows a court to dispense with consent for all adults, when, in practice, persons unable to consent are the one's affected. Indeed, given the majority view that it would be unfair to deny adoption to adults with intellectual limitations, when would a court choose not to dispense with consent for such an adult in order to proceed to a best interest analysis (majority op at 8 n 4)?[6]

The legislative history precludes the conclusion that the legislature considered this outcome. If that means that under the current framework respondent and others in her position cannot be adopted, it is for the legislature to determine whether and how to address

---

[6] The majority notes that the statute reflects a legislative determination that courts should consider the unique circumstances of every case (majority op at 8 n 4). The majority cannot avoid the obvious practical application of its decision, i.e., a court may proceed with the adoption of an adult who is unable to provide informed consent solely because of the adult's intellectual limitation (*see* majority op at 8 n 4). That is a class distinction no matter how the majority dresses it up. It is also a class distinction that we cannot make on the basis of the statute as currently written (*see infra* Section IV).

the gap in the statutory scheme.[7] Unlike judges, elected officials are constitutionally empowered to legislate on matters of public policy (*compare* NY Const, art III, § 1 ["The legislative power of this state shall be vested in the senate and assembly"], *with id.* art VI, § 3 [a] ["The jurisdiction of the court of appeals shall be limited to the review of questions of law . . . ."]). "We are not privileged, by judicial construction, to legislate" (*Matter of Metropolitan Life Ins. Co. v Boland*, 281 NY 357, 361 [1939]; *see also  Bank Markazi v Peterson*, — US —, 136 S Ct 1310, 1332 [2016, Roberts, Ch. J., dissenting] ["The Framers saw that if the power of judging . . . were joined to legislative power, the power over the life and liberty of the citizens would be arbitrary" (internal quotation marks omitted)] [citation omitted]; *Xiang Fu He*, 34 NY3d at 172 ["(W)e are not at liberty to second-guess the Legislature's determination, or to disregard—or rewrite—its statutory text"], quoting *Matter of New York Civ. Liberties Union v New York City Police Dept.*, 32 NY3d 556, 567 [2018]; *Wolpoff v Cuomo*, 80 NY2d 70, 79 [1992] ["It is not the role of this, or indeed any, court to second-guess the determinations of the Legislature, the elective representatives of the people"]).

As we have often recognized, when exercising our judicial authority to interpret statutes, courts may not "substitute their judgment for that of the Legislature as to the wisdom and expedience of the legislation" (*Matter of Malpica-Orsini*, 36 NY2d at 570). The command that we refrain from policy deliberation is in recognition that, "[u]nder the

---

[7] The majority claims to have "interpret[ed] the statute as written, without embellishment" (majority op at 9). But the statutory text is ambiguous, and, as I explain, the majority has read into the statute a carveout not therein provided.

doctrine of separation of powers courts may not legislate" (*id.* at 571; *Xiang Fu He*, 34 NY3d at 175 ["As we have repeatedly made clear, the courts do not sit in review of the discretion of the (l)egislature or determine the expediency, wisdom, or propriety of its action on matters within its powers" (internal quotation marks omitted)] [citation omitted]; *People v Francis*, 30 NY3d 737, 751 [2018] ["The constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions"]).

IV.

This is one of those cases where the legislature has not spoken on a thorny policy issue—i.e., whether to allow adoption of an adult unable to provide informed consent, and if so, how to accomplish that end. Nor has the legislature chosen language that allows us to apply traditional canons of construction to identify a legislative intent where none exists. As currently written, the statute requires an adult adoptee's consent, which respondent has not provided. Respondent's affection for petitioners does not alter the analysis of the threshold consent requirement. An adult may feel love and a connection to a petitioner but not want to be treated under the law as the petitioner's "child," nor have the petitioner stand as the adult's "parent." Affection is no substitute for informed consent.[8]

In upholding the decision below, the majority has taken to redrafting the law and not merely interpreting or construing the statutory provision as the legislature intended. This we cannot do. Until the legislature changes the law to provide an appropriate

---

[8] Given my conclusion, I have no occasion to opine on the best interest analysis as applied to respondent.

mechanism for adoption of persons with intellectual limitations who are unable to provide informed consent, we must apply the law as we find it and as the legislature intended.

I dissent.

Order affirmed, without costs.  Opinion by Chief Judge DiFiore.  Judges Stein, Fahey, Garcia and Feinman concur.  Judge Wilson concurs in result in an opinion.  Judge Rivera dissents in an opinion.

Decided November 23, 2020